## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| MICHELLE WHITMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 12 CV 50115 |
| v. | ) | |
| | ) | |
| CITIMORTGAGE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM IN RESPONSE TO DEFENDANT'S 12(B)(6) MOTION TO DISMISS

### I. INTRODUCTION AND STANDARD OF REVIEW

Plaintiff has filed suit against the Defendant, alleging tortious and fraudulent conduct under Illinois state law. Plaintiff is alleging that the Defendant deviated from the HAMP procedures it certified compliance with in order to carry out its tortious and deceitful conduct. Defendant is seeking to dismiss Plaintiff's complaint, *in toto*, under FED. R. CIV. P. 12(b)(6). For this motion, all factual allegations in the complaint are to be taken as true. Wigod. v. Wells Fargo Bank N.A., 673 F.3d 547, 555 (7th Cir. 2012). The court may also consider documents attached to the complaint without converting the motion into summary judgment. Id. at 556.

Plaintiff's cause of action is not about vindicating Defendant's violation of HAMP, nor is it seeking to supervise Defendant's compliance with HAMP.[1] Plaintiff is seeking redress for the Defendant's tortious conduct it engaged in after it executed four trial payment period ("TPP") contracts with Plaintiff. The HAMP regulations simply

---

[1] Plaintiff's complaint falls into the "third generation" of HAMP litigation as discussed in Wigod v. Wells Fargo Bank N.A., 673 F.3d 547, 559 n.4 (7th Cir. 2012). The Seventh Circuit Court of Appeals in Wigod stated that federal courts have allowed claims based on contract, tort, and/or state consumer fraud statutes to proceed under HAMP.

provide the standard of conduct that the Defendant refused to follow during the TPP. The Plaintiff's complaint is about remedying the following grievances, which, for the purposes of this motion, are deemed true:

1. By preventing Plaintiff from obtaining a permanent modification within a three-month period, Defendant significantly increased Plaintiff's mortgage balance with accrued "deficiencies". Pl. Comp. ¶ 85.

2. Defendant extracted $57,300.14 in certified funds from Plaintiff by wrongfully terminating three prior modification attempts. Pl. Comp. ¶¶ 43, 49, 86, 99.

3. Defendant's misconduct, starting in December 2009 and continuing to this day, caused Plaintiff severe emotional distress, so much so she was placed on prescription medication—twice—to cope with the situation. Defendant's tortious misconduct included, *inter alia*: (1) two *wrongful* foreclosure attempts; (2) requiring Plaintiff to *re-send* her husband's death certificate on multiple occasions; (3) impeding Plaintiff from obtaining a permanent modification so that it could artificially accrue fees and costs it could charge her—thereby allowing it to place Plaintiff's home in foreclosure once she ran out of "certified funds"—(4) putting Plaintiff in a perpetual state of fear and anxiety about losing her home; (5) and continuing to misapply Plaintiff's payments to a Ricardo Garza (an unknown third-party) even after her modification became permanent. Pl. Comp. ¶¶ 43, 46, 70, 72, 7377, 86, 99, 100, 101. *See also* Pl. Ex. J.

4. Defendant breached the trial payment plan ("TPP") contract on three prior occasions; only to finally execute a permanent modification contract on her fourth attempt after seventeen months had elapsed. To this day, however, Plaintiff's permanent modification is in jeopardy because the Defendant continues to misapply her timely mortgage payments. Pl. Comp. ¶¶ 88–95.

## II. Argument

### A. Plaintiff's Cause of Action is Seeking Redress Solely for Defendant's Violations of Illinois State Law, it is not Preempted, and Federal Law Provides the Standard of Conduct for Plaintiff's State Law Claims.

The incorporation of federal law into state claims does not disable any causes of action arising under the state law claims despite the lack of a private right of action. Wigod, 673 F.3d at 582. Defendant's argument that HAMP's absence of a private cause

of action precludes this action is premised upon preemption. *See* Def. Brief at 8. The Seventh Circuit explicitly rejected this argument in <u>Wigod,</u> 673 F.3d at 581–82 (interpreting argument that a Plaintiff cannot form an "end-run around the lack of a private right of action" as being based in preemption). HAMP's "absence of a private right of action . . . provides no reason to dismiss a claim under state law just because it refers to or incorporates some elements of federal law." <u>Id.</u> at 581; *see also.* <u>Fletcher v. Onewest Bank</u>, 798 F.Supp.2d 925, 931 (N.D. Dist. 2011) (state law remedies may be pursued even if TPP terms are prescribed by the federal government).

<u>Wigod</u> also explicitly rejected Defendant's "presumption that where Congress provides no remedy under federal law, state law may not afford one in its stead." <u>Id.</u> In fact, HAMP explicitly required Defendant to implement its program in compliance with state common law and statutes. <u>Id.</u> at 580; *see also* <u>Wyeth v. Levine</u>, 555 U.S. 555, 575 (2009) ("pre-emption is particularly weak where Congress has indicated its awareness of state law in a field of federal interest . . . and tolerate[s] whatever tension there is between them"). Where federal jurisdiction is based on diversity of citizenship, as it is here, the absence of a private right of action weighs against preemption. <u>Wigod,</u> 673 F.3d at 582. Therefore, HAMP's lack of a private right of action does not preclude or preempt Plaintiff's state law claims.

The HAMP regulations supply the standard of conduct Defendant should have conformed itself to during the TPP under Illinois law. State law can provide a cause of action based in whole or in part on violations of federal law. <u>Id.</u> Defendant's deviation from the HAMP standards is evidence of its willful, tortious, and deceitful conduct. *See e.g.,* <u>Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Manufac.</u>, 545 U.S. 308, 319

3

n.6 (2005) ("jurisdictions treat a violation of a federal statute as evidence of negligence"); Wigod, 673 F.3d at 583 ("violation of the federal standard as an element of state tort recovery did not fundamentally change the state tort nature of the action") (internal citation omitted). *Cf.* Merrell Dow Pharms. Inc. v. Thompson, 478 U.S. 804, 811–12, 816 (1986) ("the violation of the federal statute . . . [creates] a rebuttable presumption [of negligence] under state law).

The HAMP regulations cited in Plaintiff's complaint therefore delineate the standard with which the Defendant should have adhered itself to under Illinois law. HAMP regulations impute to all servicers the standard to follow and Defendant's deviation from that standard during the TPP is evidence of its intentional and willful misconduct. *See* Wigod, 673 F.3d at 579 ("the state-law duty allegedly breached is imported from and delimited by federal standards established in HAMP's program guidelines."). Therefore, Defendant's deviations from the HAMP regulations evidences the Defendant's willfully tortious conduct under Illinois law.

Plaintiff's imputation of HAMP's standard of conduct into her state law claims does not create any conflict between federal or state law. *See* id; In re: Ocwen Loan Servicing, LLC, 491 F.3d 638, 644 (7th Cir. 2007) ("Enforcement of state law in . . . mortgage-servicing . . . complement[s] rather than substitute[s] . . . the federal regulatory scheme). Plaintiff's complaint does not impose substantive duties upon the Defendant that go beyond HAMP's requirements, it simply seeks redress for tortious conduct that brought upon her substantial economic and non-economic injury. *See* id. at 580 (suits against servicers for violating state law are not foreclosed where they impose obligations that parallel those established in a federal program). Defendant's quasi-

4

compliance with HAMP was its modus operandi in violating Illinois tort law and the
Illinois Consumer Fraud Act ("ICFA"). *See* Pl. Comp. ¶ 101. Defendant's argument that
it can violate Illinois tort and statutory law—with impunity—and use federal law to cloak
it with immunity lacks precedent and should be rejected. *See* Wigod, 673 F.3d at 581
(rejecting a loan servicer's argument that if federal law does not provide a remedy to
redress for grievances, neither can state law). Therefore, Defendant's argument that
HAMP's lack of private action precludes her state based claims in this diversity action
should be dismissed.

### B. Plaintiff Plausibly Stated Claims Under the Following Illinois State and Statutory Law Causes of Action:

#### Count I: Violation of the Illinois Consumer Fraud & Deceptive Business Practices Act (ICFA)

Redressing grievances under the Illinois Consumer Fraud Act are viable actions
that are not precluded or preempted by its tangential nexus to HAMP. *See* Wigod, 673
F.3d at 555, 579 (holding that mortgagee's fraud claims for bank's allegedly unlawful
conduct under HAMP were redressable under the ICFA). Defendant's deviation from the
HAMP regulations subjects it to liability under the ICFA. *See* Wigod, 673 F.3d at 555
(finding that Plaintiff plausibly alleged that her loan servicer committed fraud under the
ICFA and HAMP.")

The ICFA protects consumers against "unfair or deceptive acts or practices,"
including "employment of any deception fraud, false pretense, false promise,
misrepresentation or the concealment, suppression or omission of any material fact." 815
ILCS 505/2. The Act "is to be liberally construed to effectuate its purpose." Robinson v.
Toyota Motor Credit Corp., 775 N.E.2d 951, 960 (Ill. 2002). To state a claim under the

Act, a plaintiff must allege: "(1) the defendant engaged in a deceptive act or practice; (2) the defendant intended that the plaintiff rely on that deception; (3) the deception occurred in the course of conduct involving trade or commerce; and (4) the act proximately caused damages to the plaintiff." Murry v. Am.'s Mort. Banc, Inc., F. Supp 2d, 2004 U.S. Dist. LEXIS 12045 (N.D. Ill. June 25, 2004).

Plaintiff's Complaint meets these requirements. Plaintiff alleges Defendant continuously used deception and made false representations with the intent to cause Plaintiff's detrimental reliance on its statements. Defendant's fraudulent actions began with its first conversation steering Plaintiff *away* from paying off her mortgage (PL. COMP. ¶ 37), and continued through the fourth modification attempt (PL. COMP ¶ 82), at which time Defendant had coerced over fifty thousand dollars from Plaintiff, and had increased Plaintiff's mortgage by $39,589.45. The Plaintiff and Defendant's relationship clearly falls within trade and commerce. *See* Wigod, 673 F.3d at 556 (finding a commercial relationship). The Defendant serviced Plaintiff's mortgage and its conduct proximately caused Plaintiff damages, which are comprised of: late fees and penalties, excessive increase in her principal balance, as well as emotional distress and its resultant physical injury. PL. COMP. ¶¶ 97–98.

In Wigod, the plaintiff argued that her actions and the defendant's representations gave her reasonable expectation of permanent modification, which the defendant deliberately misled the Plaintiff into believing she would receive. Wigod, 673 F.3d at 555. The court determined that plaintiff was not seeking redress for violations of HAMP, but rather the defendant used its misrepresentations and implementation of HAMP compliance procedures in a way to avoid plaintiff's legitimate expectations. Id. at 585.

Similarly, in this case Defendant executed three TPP contracts with the Plaintiff, only to deliberately halt the process. The three TPP terminations were never based on any alleged deficiency of Plaintiff's qualifications, but rather on Defendant's unwillingness to process her payments, by requesting duplicative documentation, and refusing to inform Plaintiff what other documentation was needed. PL. COMP. ¶¶ 45, 55, 79, 89, 90, 92, 93, 95. Defendant used fraud, deception, and misrepresentation in an attempt to keep Plaintiff from obtaining a permanent modification. Defendant's deception permitted it to accumulate fees, increase the principal balance on the mortgage, and to demand certified funds for the immediate pay off of the fees and costs the Defendant had been accruing. Defendant does not argue that Plaintiff fails to meet the requirements for an ICFA claim, but rather continues to reiterate the same argument as Part I. Without fully repeating why Defendant's argument is misguided, it is important to reiterate that the Defendant selectively implemented its HAMP compliance procedures in a way to fraudulently enrich itself at Plaintiff's expense. Therefore, Defendant's motion to dismiss regarding Count I should be denied because Plaintiff's ICFA claim is plausible.

### Count II: Intentional Infliction of Emotional Distress (IIED)

To allege a cause of action for Intentional Infliction of Emotional Distress (IIED), Plaintiff must allege facts that establish: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that its conduct would do so; and (3) the defendant's conduct actually and proximately caused severe emotional distress." Graham v. Commonwealth Edison Co., 742 N.E.2d 858 at 866 (Ill. App. 2000).

In this case, Defendant's conduct goes beyond being merely offensive to being extreme and outrageous. *See* Eckenrode v. Life of Am. Ins. Co., 470 F.2d 1, 4–5 (7th Cir. 1972) (finding that the use of economic coercion was bad faith rising to outrageousness). On three separate occasions, Defendant—a large bank that certified its compliance with HAMP—refused to complete the modification process with Plaintiff by failing to click an accept button (PL. COMP. ¶49), incorrectly calculating the modified payment amount (PL. COMP. ¶ 66), willfully claiming not having received paperwork it had *in fact* received, (PL. COMP. ¶ 77), refusing to process or misprocessing payments (PL. COMP. ¶¶ 45, 55, 79, 89, 90, 92, 93, 95), and refusing to re-send documentation Plaintiff requested (PL. COMP. ¶ 48), which resulted in Plaintiff going into foreclosure— twice. (PL. COMP. ¶¶ 49, 74). Defendant then utilized its misconduct to improperly demand immediate payment of certified funds in order for the Plaintiff to avoid foreclosure. PL. COMP. ¶¶ 49, 52, 73.

Defendant was aware from the onset that Plaintiff had just lost her husband and had two minor children, and knew, or should have known, that the continued wrongful threat of foreclosure and loss of her home would lead to severe emotional distress. *See* Eckenrode, 470 F.2d at 4 (extreme conduct may arise from Defendant's knowledge that Plaintiff's particular circumstances makes them susceptible to distress). Defendant utilized its knowledge of Plaintiff's vulnerability to keep her on the hook so that Defendant could charge additional fees, accrue additional interest, and increase the principal of the loan. *See* id. at 5 (finding outrageous conduct where the defendant knew Plaintiff was in a difficult circumstance and vulnerable to an economically powerful entity's high pressure tactics). Lastly, due to the Defendant's actions, the Plaintiff

suffered emotional distress that manifested itself in depression, anxiety, and other emotional issues that required prescription medication to help ameliorate. *See* PL. COMPL. ¶ 136–139. Plaintiff specifically made the Defendant aware that she was suffering emotional distress due to its behavior. *See* PL. EX. J.

These elements are not diminished by Defendant's continued attempt to classify its actions as acting within HAMP guidelines. In Strange, the court examined an IIED claim where the plaintiff's attempt to receive a loan modification *via* HAMP ended in foreclosure of the property. Strange v. Flagstar Bank, FSB, 2012 WL 987584 (N.D. Tex. Mar. 22, 2012). The court held that "[d]efendant's alleged violation of HAMP guidelines and performance of a foreclosure sale without providing proper notice" was not enough to sustain a claim for IIED. Strange 2012 WL 987584 at *2. However, in this case, the allegations of IIED go beyond those alleged in Strange because here there was a continued pattern of behavior over a *seventeen-month* period, including, *inter alia*, two *wrongful* foreclosure proceedings, repeatedly misapplying payments and refusing to accept payments, as well as frequently requiring Plaintiff to re-certify her husband's death with his death certificate.

In Graham v. Commonwealth Edison Co., the court identified additional factors when reviewing IIED, including the power and control the defendant has over a plaintiff and the defendant's awareness of the plaintiff's susceptibility to emotional distress. Graham, 742 N.E. 2d at 866-67; *see also* Eckenrode, 470 F.2d at 4 (stating that outrageous conduct may arise from abuse of a person's position of power to affect the interests of another, extreme bullying tactics, and high pressure methods). The Graham court held that a five-month long "sham investigation" in retaliation for plaintiff's

reporting nuclear safety violations was sufficient to allege IIED. Id. In the case at bar, Plaintiff went through a grueling seventeen-month process to modify her loan that began when Plaintiff informed Defendant that her husband had died. Defendant's response was that she could "make her money work for her" through the modification process. Therefore, the motion to dismiss Count II should be denied because the Plaintiff pleaded a plausible claim for IIED. *See* Eckenrode, 470 F.2d at 3 ("peace of mind is a personal interest of sufficient importance to receive the law's protection . . . against outrageous conduct").

### *Count III: Tortious Interference with a Property Right*

A tortious interference with a protected property interest, for which damages may be recovered, occurs when a defendant (1) threatens or makes actual bad faith refusals to fulfill its obligations under a contract and (2) maliciously employed false and threatening communications directed to the plaintiff for the purposes of causing him to surrender his rights under the contract, or to disadvantageously settle a nonexistent dispute that (3) proximately caused economic loss and emotional distress. Ledingham v. Blue Cross Plan for Hosp. Care of Hosp. Serv. Corp., 330 N.E.2d 540, 545, 548 (Ill. App. 1975) *rev'd on other grounds*; 64 Ill. 2d 338 (1976). Punitive damages may properly be awarded in such a case. Id. at 549; *see also infra* Part II.V (discussing the punitive damages count).

Illinois courts have recognized a cause of action for tortious interference with a protected property interest as tort recovery independent from IIED. *See* Ledingham, 330 N.E.2d at 540, *rev'd on other grounds*; 64 Ill. 2d 338 (1976). *See also* Marilyn Jo Kelsay v. Motorola, Inc., 74 Ill. 2d 172, 187 (Ill. 1978) (citing Ledingham, 330 N.E.2d at 540 approvingly); Urfer v. Country mutual Ins. Co., 376 N.E.2d 1073 (1st Dist. 1978)

(deciding whether plaintiff stated a cause of action under Ledingham, 330 N.E.2d at 549). While the genesis for a tortious interference with a property right claim was in the bad-faith insurance context, it has been extended to situations outside insurance law. *See* Voyles v. Sandia Mortg. Corp., 751 N.E.2d 1126 (Ill. 2001) (recognizing Plaintiff's claim for tortious interference with a property right guised as a tort for the violation of good-faith and fair-dealing, but finding insufficient facts to support the claim). The tort derives from the breach of good faith and fair dealing implied by law in all Illinois contracts. *See* Ledingham, 330 N.E.2d at 547 (citing Eckenrode, 470 F.2d at 4 (Illinois "contracts are subject to . . . implied conditions of good faith and fair dealing . . . .") The Ledingham and Eckenrode Courts held that a breach of good faith implied by law is both a breach of contract and a tort. Id. at 548; Eckenrode, 470 F.2d at 5. In Cramer v. Ins. Exchange Agency, the Illinois Supreme Court narrowed the scope of Ledingham to situations where plaintiff has no contractual remedy. 675 N.E.2d 897, 903–04 (Ill. 1996) (while duty of good-faith was originally one of contract construction, duty can give rise to a tort if contractual remedy is absent) ("conduct may give rise to both a breach of contract action and a separate and independent tort action)."

After Cramer, the Illinois Supreme Court reviewed this tort outside the insurance law context where the plaintiff sought damages for inaccurate reports allegedly sent by a defendant to credit reporting agencies. Voyles v. Sandia Mortg. Corp., 751 N.E.2d 1126 (Ill. 2001). Significantly, the Court stated that the tort regarding good faith and fair dialing is applicable in certain situations. Voyles, 751 N.E.2d 1126 at 1131. The facts in Voyles however did not support the tort. Id. at 1132.

Here, the fourth modification contract is currently being executed, denying Plaintiff of any contractual remedy. The duty of good faith is the only way to keep the Defendant honest throughout the TPP period. Other than good faith and fair dealing, there is no way to reign in the Defendant's unbridled control over the Plaintiff during the TPP period. *See* Wigod, 673 F.3d at 565 (servicer required to offer some sort of good-faith permanent modification under HAMP). The Plaintiff can *only rely* upon Defendant acting in good faith under HAMP where Defendant has exclusive power to create or deny modification and Plaintiff lacks contractual remedies. Defendant intentionally chose to exercise its unfettered control by refusing payments, sending false and threatening communications to extort certified funds, and put Plaintiff's home in foreclosure proceedings on multiple occasions. PL. COMP ¶ 147. Defendant's conduct is the quintessential paradigm of tortious bad-faith conduct.

Defendant clearly exercised bad faith in "working" with Plaintiff to settle her permanent modification. As in Eckenrode, Defendant knew Plaintiff was vulnerable and susceptible to the high-pressure tactics of an economically powerful entity, and used economic coercion knowing her plight, limited income, and vulnerability to mental distress. *See* Eckenrode 470 F.2d at 5; Ufer, 376 N.E.2d at 1076. Additionally, Defendant's egregious bad-faith in servicing loans through HAMP affects millions of people, is subject to substantial government regulation, and "stamped with government interest." Eckenrode, 470 F.2d at 5. Defendant's conduct was tortious and subjects it to state law liability for its improper interference with Plaintiff's rights. Therefore, the motion to dismiss regarding Count III should be denied because there is a plausible state claim, recognized under Illinois law, being pursued by Plaintiff.

12

### *Count IV: Tortious Interference with an Expectancy*

Plaintiff has sufficiently alleged the elements required for a claim of tortious interference with an expectancy. The elements for interference with an expectancy are (1) the reasonable expectancy of entering into a valid business relationship; (2) defendant's knowledge of the expectancy; (3) defendant's intentional interference that prevents the expectancy from becoming a valid business relationship; and (4) damages to plaintiff as a result of such interference. Voyles, 196 Ill. 2d at 288 (applying the tort to mortgage company but finding Plaintiff did not meet the third element); Malatesta v. Leichter, 542 N.E.2d 768 at 777 (Ill. App. 1989).

Plaintiff's relationship with Defendant was a business relationship. *See* Wigod, 673 F.3d at 556 (servicer relationship is a commercial one). Similarly, Plaintiff in this case had three prospective new business arrangements with the Defendant through a loan modification where there was no guarantee of a new contract. While the parties remained the same from the original loan contract and the modified contract, the expectations of performance changed, thus necessitating a new contract with different language. Wigod, 673 F.3d at 565 (terms of TPP support breach of contract claims). Thus, the TPPs constitute a new business relationship rather than a modification of past due debt. *See* Wigod, 673 F.3d at 564 (TPPs go above and beyond any existing legal duty and are more than an agreement to pay a discounted debt.)

The expectation held by Plaintiff was not solely that there would be a modification, but that there would be affirmative action during her TPP period. Plaintiff reasonably expected that Defendant would deposit all the payments necessary to receive a permanent modification. Defendant did not modify the loan or tell Plaintiff she did not

qualify for a modification, but rather engaged in an extended course of inaction, leaving Plaintiff at the mercy of the Defendant, who hindered and obstructed her permanent modification attempts in order to accrue substantial fees at Plaintiff's expense. Plaintiff also reasonably expected a permanent modification and that documentation would be sent to her within a reasonable period of time, allowing for a new contract to be executed.

Defendant had knowledge of Plaintiff's permanent modification expectancy *via* the TPP contract it entered into with the Plaintiff. Defendant continually interfered with Plaintiff's expectations by refusing to accept and/or process automatic payments, thereby artificially halting the TPP process—breaching three prior TPP contracts, and forcing her to start anew. *See* Wigod, 673 F.3d at 565 (terms of TPP support breach of contract claims). These cumulating "errors" were not merely "simple," but an intentional effort to prevent Plaintiff from receiving a permanent modification so that Defendant could charge fees, accrue the deficiency between the original payment and TPP payment, thereby increasing the principal of Plaintiff's loan. PL. COMP. ¶¶ 100, 101. Lastly, Plaintiff suffered damages in excess of fifty thousand dollars in costs and fees, as well as depression and anxiety due to Defendant's tortious interference. Therefore, the motion for dismiss regarding Count IV should be denied because there is a valid state claim brought by Plaintiff.

### V. *Pleading Punitive Damages as a Separate Count is Proper Under Illinois Law*

Illinois law permits pleading punitive damages in a separate count. *See e.g.,* Clifton v. I-Flow Corp., 2011 WL 5077615, at *4 (N.D. Ill. 2011) (applying Illinois law); Gary v. Nat'l Rest., 354 Ill App. 3d 345, 364-365 (1st Dist. 2004); Petty v. Chrysler, 343 Ill. App 3d 815, 828–829 (1st Cir. 2003); (pleading punitive damages in a separate count

of the complaint). Illinois courts "may award punitive damages if the defendant's tortious acts are malicious or display reckless disregard for another's rights." *Accord* Clifton, 2011 WL 5077615, at \*5; Petty, 343 Ill. App. 3d at 828. Punitive damages require misconduct that is above and beyond the conduct needed for the basis of the underlying cause of action. Petty, 343 Ill. App. 3d at 828. Plaintiff's complaint pleading punitive damages as a separate count is therefore proper because her punitive damages claim requires a showing of gross fraud or other exceptional circumstances evidencing malice of willfulness. *See* Clifton, 2011 WL 5077615 at \*5 (Plaintiff's independent count for punitive damages proper where it plausibly suggested that Defendant acted willfully, with malice, and conscious disregard for another's rights).

### III.    CONCLUSION

For the foregoing reasons, Plaintiff prays that this court deny the motion to dismiss, or alternatively, if it is granted, that Plaintiff be granted an opportunity to move for leave to file a first amended complaint as of right. *See* Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1111 (7th Cir. 1984).

Respectfully Submitted,

Michelle Whitmer

/s/ C. Nicholas Cronauer
One of its Attorneys

Dated:  May 30, 2012

Charles E. Cronauer & Associates
Attorneys for Plaintiff
1101 DeKalb Ave., Suite 2
Sycamore, IL 60178
(815) 895-8585 /(815) 895-4070 Fax
ARDC #s: 6305683; 546062

**CERTIFICATE OF SERVICE**

I, the undersigned and licensed attorney, certify that I have had a copy of the foregoing memorandum opposing the Defendant's motion to dismiss to be served on the following counsels of record through the CM/ECF e-filing system on May 30, 2012:

Todd A. Rowden
Scott P. Clair
Sara A. Eber
Timothy L. Binetti
THOMPSON COBURN LLP
55 E. Monroe ST., 37th Floor
Chicago, IL 60603


/s/ C. Nicholas Cronauer