**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| MICHELLE WHITMER, | |
| Plaintiff, | Case No. 12 cv 50115 |
| v. | Honorable Philip G. Reinhard |
| CITIMORTGAGE, INC., | Honorable P. Michael Mahoney, Magistrate Judge |
| Defendant. | |

**CITIMORTGAGE, INC.'S ANSWER
AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT AT LAW**

CitiMortgage, Inc. ("Citi"), by its attorneys, Thompson Coburn LLP, for its Answer and

Affirmative Defenses to Plaintiff's Complaint at Law, states as follows:

**ANSWER AND AFFIRMATIVE DEFENSES**

1.      On April 13, 2009 the Chief Financial Officer of CitiMortgage, Inc., ("Defendant") entered into a servicer participation agreement, incorporated by reference herein, with FANNIE MAE, as financial agent for the U.S. Treasury. *See* Servicer Participation Agreement ("SPA") for the Home Affordable Modification Program, attached hereto and marked as "Exhibit A."

**ANSWER:    Citi states that the terms of Exhibit A are included therein and denies any allegations inconsistent with the terms of Exhibit A.**

2.      The servicer agreement established Defendant as a participant in the U.S Treasury's Home Affordable Modification Program ("HAMP"), hereby incorporated by reference, and bound Defendant to HAMP's obligations, regulations, and procedures.

**ANSWER:    Citi admits only that it participated in the Home Affordable Modification Program ("HAMP"). Citi states that the terms of the SPA are included therein and denies any allegations inconsistent with the terms of the SPA. Citi denies all remaining allegations and legal conclusions in paragraph 2.**

3.      HAMP's purpose was to provide a uniform framework for loan modifications and foreclosure prevention services for eligible borrowers under the Emergency Economic Stabilization Act of 2008 and the American Recovery and Reinvestment Act of 2009.

**ANSWER:    Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 3 and therefore denies the same.**

4.      Defendant's participation in HAMP obligated it to specific guidelines, terms and conditions set forth by the U.S. Treasury in its "documentation, instructions, bulletins, letters, directives, or other communications that could change or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program" ("Program Documentation"). HAMP also requires servicers to comply with all state laws.  HAMP HANDBOOK, Chapter 1, § 1.6.

**ANSWER:      Citi admits only that it is required to comply with applicable state and federal laws.  Citi states that the terms of the SPA are included therein and denies any allegations inconsistent with the terms of the SPA.  Citi denies all remaining allegations and legal conclusions in paragraph 4.**

5.      The Making Home Affordable Program documentation includes a Handbook for Servicers ("HAMP Handbook"), incorporated by reference into the SPA and changes, describes, or clarifies the scope, rights, and duties of servicers as a participant in HAMP, and may prospectively change the HAMP requirements.

**ANSWER:      Citi admits only that eight versions of the HAMP Handbook have been promulgated.  Citi states that the terms of the SPA and HAMP Handbooks are included therein and denies any allegations inconsistent with the terms of the SPA and HAMP Handbooks.  Citi denies all remaining allegations and legal conclusions in paragraph 5.**

6.      The Handbook requires servicers to retain all documentation of their analysis and to document all communications (verbal and written) with a borrower. HAMP HANDBOOK, Chapter I, § 2.2.

**ANSWER:      Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

7.      Servicers are required to "develop, enforce, and review" quarterly its effectiveness for an internal control program designed to: a) "Ensure effective delivery of Services in connection with HAMP; and b) * * * c) Monitor compliance with applicable consumer protection . . . laws." Id., § 2.4.

**ANSWER:      Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

8.      Servicers must "execute an effective quality assurance program that includes independent reviews of each MHA program (*e.g.* HAMP…). Id. § 2.7.  A servicer's quality assurance program must be reviewed in order to assess risks and weaknesses that have adverse borrower impacts (*e.g.,* non-approvals, foreclosures, *et. cet.*). Id. § 2.7.2.  Potential adverse borrower impacts include, *inter alia,* the availability and responsiveness of servicing personnel to borrower inquiries, questions, complaints, and tracking and retention of documentation submitted by borrowers, and "adherence to prohibitions on referral of loans to foreclosure and conducting of scheduled foreclosure sales…" and "conduct of trial period plans, including documentation, application of payments, and use of suspense/unapplied funds accounts, credit reporting and conversion to permanent modification for . . . mortgages as appropriate." Id. § 2.7.2-3.

**ANSWER: Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

9. Servicers must review their quality assurance programs at least quarterly. <u>Id.</u> §2.6.4.3. Within fourth-five (45) days of a quality assurance review, a report must be distributed to the appropriate executives or board-level committees, including senior management. <u>Id.</u> At § 2.7.3. The plan must include a rigorous follow up process to ensure that management is remediating any issues identified in the reports. <u>Id.</u>

**ANSWER: Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

10. Servicers must file certifications stating that it was in compliance with, and the truth and accuracy of, the representations and warranties related to HAMP on a yearly basis. <u>Id.</u> § 2.6.1.

**ANSWER: Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

11. Servicers "must have adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers <u>are not required to submit multiple copies of documents.</u>" HAMP HANDBOOK, Chapter II, § 2.1. (emphasis in Complaint)

**ANSWER: Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

12. A "Right Party Contact" occurs after successful efforts by a servicer to communicate with the borrower about resolving any mortgage delinquency. "If 'Right Party Contact' is established and the borrower expresses an interest in HAMP, the servicer must send a written communication describing the Initial Package, which the borrower is required to submit to request a HAMP modification. <u>Id.</u> § 2.2.2. Servicers must provide borrowers with clear, written information designed to help the borrower understand the modification process. <u>Id.</u> § 2.1.

**ANSWER: Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

13. The servicer must resend the Initial Package communication if Right Party Contact is established, but the Initial Package has not yet been submitted by the borrower. Id. Only if the borrower does not respond may the servicer determine the borrower to be ineligible for HAMP. Id. Servicers must retain all documentation they receive from borrowers and document all communications (verbal & written) with a borrower. HAMP HANDBOOK, Chapter I, § 2.2.

**ANSWER:     Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

14. A borrower's loan cannot be referred to foreclosure unless, *inter alia*, the borrower is ineligible for HAMP or fails to make current trial period payments. HAMP HANDBOOK, Chapter II, § 3.1.1.

**ANSWER:     Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

15. The borrower's Initial Package includes evidence of income, and a Request for Modification Form and Affidavit (Collectively "RMA Form"). Id. § 4-4.1. The RMA form provides the servicer with borrower financial information and the cause of the borrower's hardship. Id. The hardship affidavit attests that the borrower is unable to continue making full mortgage payments and describes several hardships, including: reduction/loss of income that was supporting the mortgage; change in financial circumstances, and a lack of sufficient cash reserves to maintain payment on the mortgage and cover basic living expenses at the same time, *etc.* Id. § 4.1.1. [Footnote to Paragraph 15: "The initial package also requires sending in IRS Form 4506-T or 4506 T-EX, and Dodd-Frank Certification. HAMP HANDBOOK, Chapter II, § 4."]

**ANSWER:     Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

16. Cash reserves include cash, savings, money market funds, marketable stocks or bonds. Cash reserves do not include retirement accounts and assets that serve as an emergency fund. Id. A lack of sufficient cash reserves is found if the cash is insufficient to maintain payment on the mortgage and cover basic living expenses at the same time. Id. HAMP does not distinguish between short-term and long-term hardships. Id.

**ANSWER:     Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

17.   Eligible borrowers under HAMP initially enter into temporary written loan modification contracts (called a trial period plan, "TPP" for short) having a three (3) month duration that becomes permanent once the HAMP requirements outlined above are fulfilled. <u>Id.</u> § 8. A TPP notice is sent out setting forth the terms and conditions for the trial period. <u>Id.</u> §8.1. The borrower is not required to sign or return the TPP notice. <u>Id.</u> The trial period starts on the TPP effective date as indicted by the TPP notice. <u>Id.</u>

**ANSWER:**   **Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

18.   [Paragraph 18 is omitted from the Complaint.]

19.   The TPP requirements are that the borrower makes at least three (3) monthly loan payments in the modified payment amount as set forth in the TPP notice, and submits the required Initial Package documentation.  As outlined above, if the borrower does not receive the Initial Package the servicer should resend it.

**ANSWER:**   **Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.  Citi denies all other legal conclusions in paragraph 19.**

20.   TPP lowers the borrower's monthly payment to a level he or she can afford. During TPP, the modified payment is less than the borrower's original mortgage payment, comprised of the contractual principal, interest, tax and insurance payment ("PITI").  Because the modified TPP is not yet a binding obligation before permanent modification occurs, the borrower is still legally obligated to pay the servicer his or her full PITI amount owed under the original mortgage agreement before permanent modification is granted. The difference between the borrower's TPP payments and the original PITI obligation are accrued as a capitalized cost to be applied after permanent modification. Accordingly, servicers hold the lesser TPP payments received as "unapplied funds." The servicer does not apply the funds to pay-down the mortgage when received because the payment does not constitute a full "PITI" payment. HAMP HANDBOOK, Chapter II, § 8.4. "When the total of the [TPP] payments held as unapplied funds is equal to a full PITI payment," only then is the servicer "required to apply all full payments to the mortgage loan." <u>Id.</u>  Because the unapplied funds are not applied to pay down the loan every month, a deficiency accrues and increases every month. The servicer is permitted to capitalize the accrued arrearages upon permanent modification.

**ANSWER:**   **Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

21.     During the TPP stage, the servicer is allowed to capitalize accrued interest, its escrow advances to third parties, and any principal forbearance. HAMP HANDBOOK, Chapter II, § 6.3. Thus, the servicer is allowed to accrue the monthly PITI deficiency that is created by the difference in the original mortgage payment and the modified TPP payment during the temporary period. The PITI deficiency amounts that accrue during TPP period are added to the principal balance of the loan as a capitalized cost once permanent modification takes effect. The borrower has to pay back the capitalized costs over the term of the loan. The more quickly a servicer modifies a loan, the less money it will receive through accrued capital costs. *Vice versa,* the longer it takes for a servicer to permanently modify a loan, the accrued capital costs it can charge a borrower increases.

**ANSWER:     Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

22.     "Servicers are encouraged to require automated payment methods, such as automatic payment drafting under HAMP." Id. at § 8.4. Additionally, "if a borrower makes a payment that is greater than his or her TPP payment, the servicer must determine if the borrower remains eligible for HAMP and, if making the contractual payment could jeopardize eligibility, notify the borrower in writing that making payments in excess of the trial period payment may jeopardize the borrower's HAMP modification. Id.

**ANSWER:     Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

23.     When determining a borrower's eligibility for HAMP based upon income, if a Servicer believes that additional information unique to a borrower's circumstance is necessary and should be considered under HAMP, the Servicer is to exercise business judgment in how the servicer calculates the borrower's income. Id. § 5.1. Servicers should use good business judgment when verifying a borrower's income. Id.

**ANSWER:     Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

24.     A servicer cannot refer a loan in the TPP stage to foreclosure unless, *inter alia,* the borrower fails to make the current trial period payments or fails to provide the required information to the servicer after the servicer requests the documentation on two separate occasions. HAMP HANDBOOK, Chapter II, § 3.1.1.

**ANSWER:     Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

25.    Under HAMP, servicers must report the borrower as current to the credit bureau reporting agencies if the borrowers are in fact current. Additionally, servicers are required to report a "full file" status report to the credit reporting agencies for each loan under HAMP. Full-file reporting means that the servicer must describe the exact status of each mortgage it is servicing as of the last business day of each month. Id. § 12.2.

**ANSWER:    Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

26.    A borrower transitions from TPP to a permanent modification when a servicer has "received all required trial period payments timely and all other required documentation from the borrower, including a fully executed Modification Agreement." HAMP HANDBOOK, Chapter II, § 9. Servicers are to prepare the permanent HAMP modification agreement early enough to allow sufficient processing time for the modification to become effective on the first day of the month following the three month trial payment period. Id.

**ANSWER:    Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

27.    Once permanent modification occurs, all late charges, penalties, and other fees must be waived and no administrative costs may be charged to the borrower.  § 9.3.2-9.3.3. After modification, servicers must report the modification and are to ensure that all borrowers who receive a permanent modification are reported to credit agencies using the 'CN' Special Comment Code and not the 'AC' Special Comment Code.

**ANSWER:    Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

28.    Servicers are permitted to capitalize any deficiency in the PITI payments that accrued during the TPP stage once permanent loan modification occurs. HAMP HANDBOOK, Chapter II, § 6.3.

**ANSWER:    Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

29.    "If an eligible borrower successfully completes the trial period and should have been converted to a permanent modification, but for reasons beyond his or her control was not timely converted to a permanent modification,…the servicer must offer the borrower a modification that puts the borrower in the same position as he or she would have been if the servicer converted the borrower to a permanent modification." Id. § 9.5. Payments made after the modification date but before conversion are to be applied retroactively." Id.

**ANSWER:    Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

30. A servicer receives $1,000 from the government for each loan that is permanently modified under HAMP. Id. § 13.1.1.

**ANSWER:** **Citi admits the allegations in paragraph 30.**

31. Defendant is the servicer of Plaintiff's home mortgage, investor loan number 5002562814, which was secured by property commonly known as 13 North 528 French Road, Hampshire, IL 60140.

**ANSWER:** **Citi admits the allegations in paragraph 31.**

32. Plaintiff's loan is a non-GSE loan, falling within the Treasury's HAMP regulations and the Servicer Participation Agreement outlined above.

**ANSWER:** **Citi admits only that Plaintiff's loan is a non-government sponsored entity loan. Citi states that the remaining allegations in paragraph 32 are legal conclusions to which no answer is appropriate. Answering further, Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

33. Defendant, at all relevant times herein, was the servicer of the Plaintiff's mortgage under the Making Homes Affordable Act. Defendant has accepted billions of dollars from the government as part of the Emergency Economic Stabilization Act of 2008 and the American Recovery and Reinvestment Act of 2009 that was passed by Congress. Defendant's acceptance of "bail-out" money bound it to the obligations and requirements of the HAMP program under the Making Homes Affordable Act discussed above.

**ANSWER:** **Citi admits only that it is the servicer of Plaintiff's mortgage. Citi denies that it "accepted billions of dollars" as part of the Emergency Economic Stabilization Act of 2008 and the American Recovery and Reinvestment Act. Citi states that the remaining allegations in paragraph 33 are legal conclusions to which no answer is appropriate.**

34. In August 2009, Plaintiff tragically lost her husband. After her husband's untimely death, Plaintiff was unable to afford her mortgage payment and meet the basic living expenses for herself and her two children. The loss of her husband's income resulted in an economic hardship under HAMP because of the reduction/loss of his income that was supporting the mortgage. Plaintiff's only income is social security survivor benefits that are used to provide for herself and her two children.

**ANSWER:** **Upon information and belief, Citi admits only that Plaintiff's husband passed away in August, 2009. Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 34 related to Plaintiff's sources of income and Plaintiff's ability to afford her mortgage payment and meet the basic living expenses for herself and her two children and therefore denies the same. Citi admits that Plaintiff certified that she suffered a loss of income and economic hardship as part of her HAMP application. Citi states that the remaining allegations related to Plaintiff's eligibility under HAMP are legal conclusions to which no answer is appropriate.**

35.    In December 2009, Plaintiff contacted Defendant *via* telephone in order to receive her mortgage pay-off amount. At the time, Plaintiff's mortgage principal balance was $183,100. Plaintiff intended to pay off her mortgage from life insurance proceeds received after her husband's death.

**ANSWER:    Upon information and belief, Citi admits only that Plaintiff contacted Citi in December, 2009 regarding her mortgage.  Answering further, Citi admits only that the principal balance of Plaintiff's mortgage in December, 2009 was approximately $183,100 and states that the modified deferred balance of Plaintiff's loan in December, 2009 was $28,330.69 and that any payoff of Plaintiff's loan would include the outstanding principal balance, the modified deferred balance, plus additional amounts for interest and taxes paid on Plaintiff's behalf.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 35 and therefore denies the same.**

36.    Life insurance proceeds are not listed as income under HAMP. HAMP does not distinguish between short-term and long-term hardships for eligibility purposes. Id. § 4.1.1. The small amount of life insurance proceeds Plaintiff received was insufficient to simultaneously maintain Plaintiff's payment on her original mortgage and to cover her long-term living expenses for herself and her two minor children. Plaintiff's monthly income is derived from social security survivor benefits, which she uses to support two dependent children.

**ANSWER:    Citi lacks knowledge or information sufficient to respond to the allegations related to Plaintiff's sources of income, how Plaintiff uses her income and the sufficiency of Plaintiff's income to maintain her mortgage payments and cover long term living expenses for herself and her children and therefore denies the same.  Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.**

37.    During the December phone call, Plaintiff spoke with Crystal, an employee of the Defendant, at 1-877-202-6502 ext. 1803468, about paying off her loan.  Crystal, after speaking with several supervisors regarding Plaintiff's pay-off request, immediately offered to modify Plaintiff's loan. Crystal, upon the advice from her supervisors—also employed by the Defendant—encouraged a modification so that Plaintiff could invest the life insurance proceeds elsewhere so that she could "make [her] money work for [her]".

**ANSWER:    Upon information and belief, Citi admits that Plaintiff contacted Citi in December, 2009 regarding her mortgage and that loan modification options were discussed with Plaintiff.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 37 and therefore denies the same.**

38.    Plaintiff provided Crystal with certain financial information and was told—over the telephone—that her new payment amount would be $1,293.83 due on January 1, 2010, with 2% interest for five years and that interest would never exceed 4.75%. Plaintiff was told to expect a modification packet *via* UPS within a couple of weeks. Upon information and belief, the "modification packet" Defendant's agent referred to was the Initial Package that HAMP requires servicers to send to eligible borrowers.

**ANSWER:    Upon information and belief, Citi admits that Plaintiff discussed a trial loan modification that would involve monthly payments of $1,293.83 and an escrow payment of**

**$634.60 with the first payment due on January 1, 2010. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 38 and therefore denies the same.**

39.    On January 1, 2010, Plaintiff made her first TPP payment to Defendant in the amount of $1,293.83 by issuing check #44835 that cleared on January 19, 2010. Plaintiff's January 1, 2010 payment constituted her acceptance of HAMP and its conditions.

**ANSWER:    Citi denies the referenced check cleared. Citi states that the remaining allegation in paragraph 39 is a legal conclusion to which no answer is appropriate.**

40.    On January 19, 2010, Plaintiff contacted Defendant to inform them that she had not yet received her Initial Package. Plaintiff was informed by an employee of Defendant that receipt of the "modification packet" may take even longer than originally advised because the mortgage department was "overwhelmed."

**ANSWER:    Citi admits only that, upon information and belief, Plaintiff contacted Citi on or about January 19, 2010 regarding her mortgage. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 40 and therefore denies the same.**

41.    Plaintiff contacted Defendant in February 2010 to make her payment for the month. Defendant's employee asked Plaintiff to authorize the next three TPP mortgage payments with her over the telephone so that her modification would not be at risk if a payment was missed. Plaintiff arranged for three payments of $1,293.83, to be deducted automatically from her checking account on 3/1/10, 4/1/10, and 5/1/10. Plaintiff received a confirmation letter dated 2/13/10 that outlined the payment authorizations. Plaintiff also informed the employee that she still had not received her modification packet, and once again, was told to be patient because the mortgage department was "overwhelmed."

**ANSWER:    Citi admits only that, upon information and belief, Plaintiff contacted Citi in February, 2010 and arranged for automatic payments and that, upon information and belief, Plaintiff informed Citi that she had not received documents. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 41 and therefore denies the same.**

42.    On March 5, 2010, the automatic payment, draft 1, scheduled for the month of March in the amount of $1,293.83 cleared her account. Later that month Plaintiff received a collection call for her loan despite her payment.

**ANSWER:    Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 42 regarding collection calls and therefore denies the same. Citi denies all remaining allegations in paragraph 42.**

43.     During the week of April 11, 2010, Plaintiff received a UPS envelope. The UPS envelope did not contain Plaintiff's Initial Package, but were statements showing arrearages and a "Helping You Stay in Your Home" flyer. Plaintiff immediately contacted Defendant. Defendant's employee told her that her loan was in foreclosure. She replied that the loan was in modification as she understood it to be. Defendant's employee then stated he could see the notes in her file regarding modification and that she should contact the modification department about her modification packet. Plaintiff asked if her loan modification was in danger, which the employee replied that it was not.

**ANSWER:     Citi admits, upon information and belief, that a document was sent to Plaintiff in April, 2010 related to loan modification options and that Plaintiff contacted Citi in April, 2010 to discuss her mortgage.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 43 and therefore denies the same.**

44.     Prior to instituting the April 2010 foreclosure, Defendant did not request any information from Plaintiff on two separate occasions as required under HAMP. *See* HAMP HANDBOOK, Chapter II, § 3.1.1.

**ANSWER:     Citi states that the terms of the eight versions of the HAMP Handbook are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.  Citi states that the remaining allegation in paragraph 44 is a legal conclusion to which no answer is appropriate.**

45.     On April 19, 2010, Plaintiff received a letter from Defendant dated April 12 that claimed her automatic check/draft 2 in the amount of $1,293.83 was returned for "unable-to-locate account number." The letter further stated that the "reversal of this payment may have caused your account to become delinquent and could result in your delinquency being reported" to credit reporting agencies. Thereafter, in said letter, Defendant demanded $19,919.74 in certified funds to be sent immediately because Plaintiff's August 1, 2009 payment was due. *See* Letter from Defendant to Plaintiff, attached hereto and marked as "Exhibit B".

**ANSWER:     Citi states that the content of the letter attached as Exhibit B is included therein and denies any allegations inconsistent with the content of Exhibit B.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 45 and therefore denies the same.**

46.     Plaintiff's account was "unable to be located" in April despite her account being located just fine during her January, February, and March 2010 payments.  Upon information and belief, Defendant was unwilling to provide the correct account information necessary to draft Plaintiff's April payment, despite providing her correct information for draft payments from Plaintiff's checking account in January, February,

**ANSWER:     Citi denies the allegations in paragraph 46.**

47.     In response to the above letter received in April 2010, Plaintiff frantically made four phone calls and spoke with various employees of the Defendant, most of whom did not know what was going on with Plaintiff's loan.

**ANSWER:     Citi admits only that, upon information and belief, Plaintiff contacted it on or about April 19, 2010.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 47 and therefore denies the same.**

48.     Up to this point, Plaintiff had yet to receive her Initial Package and Defendant never sent out another Initial Package, nor requested any other documentation, despite Plaintiff's repeated attempts to inform them of her non-receipt. Up to this point, every time Plaintiff requested information over the phone about her Initial Package she was simply told to be patient. Additionally, Plaintiff expressed concern in April regarding collection calls and/or letters being sent to her. Defendant replied that she should "disregard" the communications because they were "computer generated."

**ANSWER:     Upon information and belief, Citi admits only that Plaintiff informed Citi that she had not received an initial package.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 48 and therefore denies the same.**

49.     In April 2010, Plaintiff eventually discovered that her loan was in foreclosure and that it would be filed on May 4, 2010. Plaintiff was informed by an employee of the Defendant that the reason she never received her Initial Package was because Defendant's employee did not click the "accept" button to verify Plaintiff's verbal acceptance of the terms of the modification agreement on December 12, 2009. Despite receiving numerous apologies from the Defendant's employees for Crystal's "error," Plaintiff was told that the only way to avoid foreclosure and her "unfortunate" situation was to cure the debt.

**ANSWER:     Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 49 and therefore denies the same.**

50.     Sometime at the end of April, desperate to avoid foreclosure, Plaintiff called the Defendant and spoke with a Rita at 1-800-422-1498, ext. 1801822, an employee of the Defendant, who stated that she would begin another—Plaintiff's Second—modification attempt.  However, Rita stated that this would not stop the pending foreclosure process.  Shortly after Plaintiff had contacted Rita, a Kami M. Defendant's employee at 1-800-422-1498, ext. 1801822, began handling Plaintiff's account.

**ANSWER:     Citi admits only that, upon information and belief, Plaintiff contacted Citi in late April, 2010 regarding her mortgage and that a HAMP modification evaluation process was initiated on or about this date.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 50 and therefore denies the same.**

51.     On or about April 27, 2010, Plaintiff received the Initial Package for her Second Modification Attempt. Plaintiff immediately responded by sending the Defendant the requested documentation.

**ANSWER:     Citi admits only that Plaintiff responded to her receipt of the Initial Package dated April, 2010 by providing certain information.  Citi denies that it immediately received all requested information. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 51 and therefore denies the same.**

52.     On May 3, 2010, Rita stated that she could not complete the second modification for the Plaintiff prior to her home being filed as a foreclosure and that her home would go through the foreclosure process, which was to be filed on the very next day. Plaintiff immediately obtained cashier's check #100103221, drawn on Amcore Bank for $23,933.88, and made it payable to Defendant in order to avoid the foreclosure. *See* Cashier's Check drawn on AMCORE bank made payable to Defendant, dated May 3, 2010, attached hereto and marked as <u>"Exhibit C"</u>.

**ANSWER:     Citi states that the content of Exhibit C is included therein and denies any allegations inconsistent with the content of Exhibit C.  Citi admits only that Plaintiff contacted Citi regarding the status of her mortgage on May 3, 2010, and answering further, Citi states that Plaintiff was told that the foreclosure sale could be postponed pending a decision on her modification. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 52 and therefore denies the same.**

53.     Upon information and belief, of the $23,933.88 payment Plaintiff made, Defendant only applied $917.52 to the principal balance; $1,619.80 was applied to escrow; $12,667.89 was applied to accrued interest; $3,259.47 was applied towards real estate taxes; and $5,469.20 went to Defendant for other fees and costs.

**ANSWER:     Citi denies the allegations in paragraph 53.**

54.     As of May 5, 2010, Plaintiff's account was "current" after the $23,933.88 cashier's check was applied to her account. Despite the cashier check making her loan status "current" for credit reporting purposes, Defendant continued to report Plaintiff as "late" to the credit bureaus until May of 2011, when her modification became permanent.

**ANSWER:     Citi admits only that Plaintiff's account was current when the funds from Plaintiff's cashier's check were applied on May 13, 2010, and answering further, states that Plaintiff's account became delinquent when her January, 2010 check was returned on May 18, 2010. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 54 and therefore denies the same.**

55.     On or about May 19, 2010, Plaintiff received another letter from Defendant stating that her check/draft number 3 in the amount of $1,293.83 was returned for "unable to locate account number." The letter further stated that the reversal may have caused the account to become delinquent and that $2,309.99 was due immediately in certified funds.

**ANSWER:     Citi admits only that, upon information and belief, a letter was sent to Plaintiff on or about May 19, 2010.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 55 and therefore denies the same.**

56.     Upon information and belief, Defendant deliberately invalidated Plaintiff's second and third automatic draft check payments in order to prevent her from obtaining a permanent modification by intentionally omitting Plaintiff's checking account number from these drafts. As a result, Plaintiff's banking institution did not know from which customer account funds were to be drawn on and disbursed to Defendant for payment, thus returning them unpaid.

**ANSWER:     Citi denies that it "deliberately invalidated" Plaintiff's second and third automatic payments to prevent Plaintiff from obtaining a modification.   Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 56 and therefore denies the same.**

57.     Upon information and belief, Defendant could have utilized the account information from Plaintiff's successful January, February, and/or March 2010 payments for her April and May payments.

**ANSWER:     Citi denies the allegations in paragraph 57.**

58.     On or about May 29, 2010, Plaintiff received a letter from the Defendant dated May 28, 2010 thanking her for participating in a foreclosure prevention program. The Defendant stated therein that it had received her Initial Package information and it was being forwarded for review. *See* Letter dated May 28, 2010 from Defendant to Plaintiff, attached hereto and marked as "Exhibit D."

**ANSWER:     Citi states that the content of the letter attached as Exhibit D is included therein and denies any allegations inconsistent with the content of Exhibit D.**

59.     On June 1, 2010, Plaintiff authorized by telephone a TPP payment to the Defendant for $1,293.83. Plaintiff believed, and was not told otherwise, that her second-modification attempt would not be a different amount than her first modification attempt. Despite Plaintiff's June 2010 payment, Defendant never applied the payment to her account. *See* Group "Exhibit E."

**ANSWER:     Citi admits, upon information and belief, that Plaintiff authorized a payment on or about June 1, 2010 in the amount of $1,293.83.   Citi denies that it failed to apply Plaintiff's June 1, 2010 payment to her account.   Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 59 and therefore denies the same.**

60.     At the end of June 2010, Defendant sent an urgent notice to Plaintiff requesting her most recent personal checking, savings, money market, mutual funds, stock and bond statements. Plaintiff immediately sent the requested information.

**ANSWER:     Citi admits that a request for documents was sent to Plaintiff on or about June 28, 2010.   Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 60 and therefore denies the same.**

61.     Sometime in July of 2010, Plaintiff called to arrange for the July payment to be deducted from her checking account. Dan A. at 1-866-751-6912, ext. 47627, an employee of Defendant, was now assigned to her modification. Dan A. told Plaintiff that he was unable to accept her payment as the terms of her modification were about to change. Plaintiff did not feel comfortable not making a payment so she asked if she could make a payment in her pre-modification amount. He discouraged her from making a payment, stating "it makes more sense to wait until [her] new modification was complete and repay July's payment at a much lower rate."

**ANSWER:     Citi admits only that, upon information and belief, Plaintiff contacted Citi regarding her mortgage payments in or about July, 2010.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 61 and therefore denies the same.**

62.     On August 1, 2010, Plaintiff contacted Defendant's agent Dan A. again and asked how much she needed to pay this month. Dan A. stated that there was still no new information available about her modification status or how much to pay. Plaintiff, uncomfortable with another month of non-payment, made a payment for $2,150.52, which cleared on August 2, 2010. Defendant never applied Plaintiff's August payment to her account. *See* Group "Exhibit F."

**ANSWER:     Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 62 and therefore denies the same.**

63.     On September 20, 2010 Plaintiff sent Dan A. an email wherein she informed him she had not received a "CitiMortgage Solutions package" within 5-7 days of a September 1, 2010, text message she had received.  Plaintiff further requested that the Defendant's employee get back to her because she is tired of the stress from the prolonged modification process.
**ANSWER:     Citi admits only that, upon information and belief, Plaintiff contacted Citi regarding her mortgage payments in or about September, 2010.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 63 and therefore denies the same.**

64.     Plaintiff called Defendant again in September 2010 and was told that she would begin her new trial plan on October 1, 2010 and that her new payment amount would be approximately $1,600.00, with the paperwork to follow. In December, 2011, Defendant stated it is "missing" Plaintiff's 2010 statements from September through December after Plaintiff requested copies of her statements. *See* Letter from Defendant to Plaintiff dated December 22, 2011, attached hereto and marked as "Exhibit G."

**ANSWER:     Citi admits only that, upon information and belief, Plaintiff contacted Citi regarding her mortgage payments in or about September, 2010.  Citi states that the content of the letter attached as Exhibit G is included therein and denies any allegations inconsistent with the content of Exhibit G.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 64 and therefore denies the same.**

65.     Plaintiff received a letter from Defendant on September 28, 2010 wherein it stated she was approved to enter a trial period plan under HAMP and that her first payment date was October 1, 2010 for $2,049.79 and lasting for three months. *See* Letter from Defendant dated September 28, 2010, attached hereto and marked as "Group Exhibit H."

**ANSWER:     Citi states that the content of the letter attached as Exhibit H is included therein and denies any allegations inconsistent with the content of Exhibit H.**

66.     Defendant incorrectly calculated the monthly trial payment for the Second Modification TPP.  Plaintiff's "modified" payment was higher than her original mortgage payment of $2,033.50.  Plaintiff's trial payment plan was based upon $10,312.00 in monthly gross income with $634.44 per month in escrow. "Grp. Ex. H". Additionally, her modified interest rate increased to 6.75% and had an escrow shortage of $2,416.29. "Grp. Ex. H." Plaintiff's monthly income was only $4,125, derived from social security benefits, not the $10,312.00 as stated in the letter. Under HAMP, a modification with a PITI payment that is greater than the pre-modification PITI payment is prohibited. HAMP HANDBOOK, Chapter II, § 9.3.7.7.  Upon information and belief, Defendant's internal quality assurance controls should have prohibited Plaintiff's second modification TPP payment because it was greater than Plaintiff's original PITI payment.

**ANSWER:     Citi admits that the TPP payment amount of $2,033.50 was not based on the monthly gross income Plaintiff represented that she received. Citi states that the content of the letter attached as Exhibit H is included therein and denies any allegations inconsistent with the content of Exhibit H.  Citi states that the remaining allegations in paragraph 66 are legal conclusions to which no answer is appropriate and, answering further, states that the terms of the HAMP Handbooks are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 66 and therefore denies the same.**

67.     After receiving the letter, Plaintiff immediately contacted Dan A. to inform him of the error. Dan A. stated that he noticed the incorrect calculation before it was mailed out so he sent the file to another department to be corrected. He further stated that when the documents were returned to him the second time he assumed they were adjusted to the correct figures and signed off on the erroneous documents without reviewing them.  He further stated that he was not able to give Plaintiff a definitive amount to pay for her October 1, 2010 payment because the payment was going to change, again, by starting a Third Modification process.

**ANSWER:     Citi admits only that, upon information and belief, Plaintiff contacted Citi regarding her mortgage payments in or about late September or October, 2010.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 67 and therefore denies the same.**

68.     Later in October 2010, Defendant's agent Dan A. informed Plaintiff that her new payment amount was $1,613.15 and that it would begin on November 1, 2010. He also stated that the revised documents would be sent quickly. Based on the forgoing, Plaintiff made the following payments:

a) On 11/1/2010 check #1117 was issued in the amount of $1,613.15, which cleared;
b) On 12/6/2010 check #5000 in the amount of $1,613.15, which cleared;
c) On 1/3/2011 check #1231 in the amount of $1,613.15, which cleared;
d) On 2/3/2011 check #5005 in the amount of $1,613.15, which cleared;
e) On 3/3/2011 check #5013 in the amount of $1,613.15, which cleared;

**ANSWER:     Citi admits only that Plaintiff was approved for a TPP plan with a payment amount of $1,613.15 beginning November 1, 2010.  Upon information and belief, Citi admits that Plaintiff made five payments in the amounts of $1,613.15 each between November, 2010 and March, 2011.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 68 and therefore denies the same.**

69.     Every month, November through March, 2011, when Plaintiff arranged for her payment *via* telephone, she inquired about the status of her Initial Package for her third modification attempt.  Plaintiff was routinely told to be patient because the mortgage department was "overwhelmed." She was also told that her modification was essentially completed by her payment and that the paperwork was "just a formality."

**ANSWER:     Citi admits only that Plaintiff contacted Citi to inquire about the status of her loan modification between November, 2010 and March, 2011.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 69 and therefore denies the same.**

70.     Plaintiff received two text messages from Defendant stating that the documents relating to her modification had been mailed and to expect them in 5-7 business days. Plaintiff did not receive the documents within the timeframe as stated *via* text message. Defendant's representatives, when Plaintiff subsequently inquired about the status of her modification after receiving the text messages, was told that the messages were computer generated and to disregard them. In November 2010 and February 2011 Plaintiff was prescribed Lexapro by her Doctor in order to treat her depression and generalized anxiety that was arising from the protracted modification process.

**ANSWER:     Citi cannot respond to the allegation that the HAMP documents were not provided "within the timeframe" because Plaintiff does not allege the dates she received the text messages and therefore denies the allegations.  Upon information and belief, the HAMP documents were delivered to Plaintiff's front door on or about February 7, 2011. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 70 and therefore denies the same.**

71.    Despite Plaintiff's repeated calls informing Defendant that she had not received any documents as expected, Defendant never resent the Initial Package for her third modification attempt. During this time, Plaintiff was still making her TPP payments. During the week of March 6, 2011, Plaintiff discovered a "Home Affordable Modification Agreement" relating to her third modification attempt. The agreement was delivered to a door that Plaintiff did not use during the winter months. The agreement was dated January 7, 2011. Plaintiff immediately drove to the nearest UPS store to mail the agreement. *See* Modification Agreement dated January 7, 2011, attached hereto and marked as "Exhibit N."

**ANSWER:    Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 71 and therefore denies the same.**

72.    The modification agreement dated January 1, 2011 that was sent to Plaintiff for the third modification attempt was unnecessary for her acceptance into the HAMP program and/or permanent modification because she had already been making her TPP payments and Defendant had received all necessary documentation during Plaintiff's second modification attempt. The documentation required from the agreement should have already been in Defendant's file for them to review. Upon information and belief, Defendant never attempted to send another modification agreement other than the one dated on January 7, 2011. Moreover, the agreement required Plaintiff's deceased husband's signature despite her having had faxed his death certificate on several occasions after informing them of his passing.

**ANSWER:    Citi admits only that the January 7, 2011 modification agreement contained a space for Plaintiff's husband's signature.  The remaining allegations set forth in paragraph 72 are legal conclusions to which no answer is appropriate and, answering further, Citi states that the terms of the HAMP Handbooks are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks.  To the extent any remaining allegations are construed as factual, Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 72 and therefore denies the same.**

73.    On or about March 24, 2011, Plaintiff received a letter from Defendant stating that her loan was in default due to her failure to pay as required by the note and mortgage. Defendant requested that $13,423.53 be sent to it in certified funds in order to cure her default. *See* Letter from Defendant to Plaintiff dated March 23, 2011, attached hereto and marked as "Exhibit I." Defendant stated therein that unless it received the certified funds by April 23, 2011, it would accelerate the debt and that her home may be sold under the terms of the security instrument. Id.

**ANSWER:    Citi states that the content of the letter attached as Exhibit I is included therein and denies any allegations inconsistent with the content of Exhibit I.**

74.     Plaintiff immediately called the Defendant and was told that her loan would be referred to the Foreclosure Department on April 29, 2011. She was told that Matt P., Defendant's employee, available at 1-800-422-1498, ext. 1802680, was now handling her account.  Matt claimed he had been trying to contact Plaintiff's deceased husband *via* a disconnected land-line number, his cell-phone number, and his e-mail address. Matt, after Plaintiff instructed him that she had updated her contact information with the Defendant sometime in 2009, stated that he could see in the system where someone noted that her contact information was updated, but that the new information was never actually entered into the computer system. Matt apologized and said that the problem was "our mistake."

**ANSWER:     Citi admits only that, upon information and belief, Plaintiff contacted Citi regarding her mortgage payments in or about late March, 2011.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 74 and therefore denies the same.**

75.     Before Plaintiff's dealings with Matt in March 2011, Plaintiff had received one email from Defendant's employee, Dan A., at her current email address. Dan A. utilized Plaintiff's updated account information on Defendant's file. Upon information and belief, Plaintiff's new contact information was in Defendant's system and available for the Defendant's employee to use in order to contact Plaintiff regarding her third modification attempt.

**ANSWER:     Citi cannot respond to the allegation related to whether Plaintiff's current contact information was in its file because the contact information is not identified in the allegation and therefore denies this allegation.   Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 75 and therefore denies the same.**

76.     Plaintiff filed an appeal to reset her loan (Case #242), but her case was declined on April 19, 2011 and closed on April 20, 2011. On April 1, 2011 an ACH debit in the amount of $1,613.15 cleared Plaintiff's account.

**ANSWER:     Upon information and belief, an appeal regarding one of Plaintiff's modification attempts was filed and assigned case number 242 and the appeal was declined. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 76 and therefore denies the same.**

77.     Sometime in April 2011, Plaintiff came in contact with Defendant's employee, Barbara, after she answered Matt's telephone line. Barbara informed Plaintiff that she could see in the system where her modification contract was received on March 9, 2011, but that her modification attempt was closed on March 10, 2011 because "they had not received it."

**ANSWER:     Upon information and belief, Citi admits only that in April, 2010 Plaintiff contacted Citi regarding her mortgage.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 77 and therefore denies the same.**

78.     On April 29, 2011, Plaintiff faxed to Defendant's employee Barbara at 1-800-422-1498, ext. 1802685 the documentation already received by the Defendant on multiple occasions. Plaintiff sent *via* fax and overnight mail, documents containing: (1) 2011 social security income, (2) her husband's death certificate, (3) a hardship affidavit, (4) Form 4506-T; (5) '09-'10 tax returns; and two recent bank statements. In the letter to Defendant dated April 29, 2011, Plaintiff states she is "truly concerned about my ability to manage this situation any longer." *See* Plaintiff's cover letter to Defendant, dated April 29, 2011, attached hereto and incorporated by reference as "Exhibit J."

**ANSWER:     Upon information and belief, Citi admits that Plaintiff faxed documents reflecting social security income, her husband's death certificate, two months of bank statements, an executed hardship affidavit, a form 4506T-EZ, her tax return for the 2009 tax year, and her tax return for the 2010 tax year, on or about April 29, 2011. Citi states that the content of Exhibit J is included therein and denies any allegations inconsistent with the content of Exhibit J. Citi lacks knowledge or information sufficient to respond to the remaining allegations n paragraph 78 and therefore denies the same.**

79.     On May 1, 2011 Plaintiff called to arrange her payment for the month but the Defendant's representative refused to process it. Plaintiff immediately sent a cashier's check #61856299 for $1,613.15 that Defendant applied as her June 2011 payment rather than May 2011. *See* Cashier's Check #61856299 drawn on Harris Bank made payable to Defendant, attached hereto and marked as "Exhibit K."

**ANSWER:     Upon information and belief, Citi admits that on May 1, 2011 Plaintiff made a payment in the amount of $1,613.15. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 79 and therefore denies the same.**

80.     After Defendant refused to process her May TPP payment, Plaintiff called the modification department but was told her file needed other documentation in order to complete her modification. Plaintiff was able to get in contact with Melinda, another employee of Defendant, who reviewed Plaintiff's file. Melinda asked for Plaintiff to provide copies of her children's birth certificates. On May 4, 2011, Plaintiff faxed the requested information to Melinda.

**ANSWER:     Citi admits only that a Citi employee requested birth certificates for Plaintiff's children and that Plaintiff provided the requested birth certificates on or about May, 2011. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 80 and therefore denies the same.**

81.     On or about May 4, 2011, Plaintiff contacted an attorney who called the Defendant in order to speak with a representative about all the problems Plaintiff had been having with receiving a modification. Subsequently, Plaintiff received several calls from Defendant requesting additional documentation. On May 9, 2011, Defendant sent Plaintiff an Initial Package for her fourth attempt at her loan modification.

**ANSWER:     Citi admits that it was contacted by an attorney representing Plaintiff in May, 2011. Citi admits that it sent Plaintiff a request for information related to her loan modification application in May, 2011. Citi denies that the May 9, 2011 mailing was an "Initial Package," and states that it was a HAMP Agreement. Citi lacks knowledge or**

information sufficient to respond to the remaining allegations in paragraph 81 and therefore denies the same.

82.     Plaintiff, having sent back the Initial Package for her fourth modification attempt shortly after May 9, 2011, was granted a permanent modification. *See* Statement for Account #5002562814-5 dated June 1, 2011 attached hereto and marked as "<u>Exhibit L</u>."

**ANSWER:     Citi admits only that Plaintiff was granted a permanent modification. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 82 and therefore denies the same.**

83.     As of May 17, 2011, the principal balance of her loan was $181,765.02. After the permanent modification, Plaintiff's principal balance increased to $221,354.47, as shown on her June 1, 2011 statement, the first month of her permanent modification.

**ANSWER:     Upon information and belief, Citi admits the allegations in paragraph 83. Answering further, Plaintiff's loan had a deferred balance of $28,330.69 on May 17, 2011 and had no deferred balance on June 1, 2011.**

84.     On or about May 18, 2011, Plaintiff received her statement from the Defendant and it showed a current payment due as $22,183.11. Plaintiff called Defendant's agent Matt regarding the high-amount owed and he stated that he would add the amount on to the back of the loan. Matt also stated Plaintiff's home was NOT in danger of being filed as a foreclosure because everything was showing as current.

**ANSWER:     Citi admits only that Plaintiff's May 18, 2011 statement reflected a current amount due of $22,183.11 and, upon information and belief, that Plaintiff contacted Citi regarding her mortgage payments in or about May, 2011.   Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 84 and therefore denies the same.**

85.     Upon information and belief on or about June 1, 2011, Defendant capitalized (added to Plaintiff's principal balance) approximately $39,589.45 pursuant to her permanent modification.

**ANSWER:     Citi admits only that in May, 2011 it capitalized approximately $39,000 and denies all remaining allegations in paragraph 85.**

86.     On June 7, 2011, Plaintiff received a letter from Defendant that foreclosure proceedings were about to begin due to a lack of payment. *See* Later dated June 7, 2011 from Defendant to Plaintiff, marked as "<u>Exhibit O</u>."

**ANSWER:     Citi states that the content of the letter attached as Exhibit O is included therein and denies any allegations inconsistent with the content of Exhibit O.**

87.     Unbeknownst to Plaintiff, Defendant had already filed a foreclosure action against her and her deceased husband in the 16th Judicial District on May 26, 2011. Plaintiff first became aware of the foreclosure when a neighbor called and asked her about it. Subsequently, Plaintiff received hundreds of solicitations addressed to her husband that offered foreclosure prevention assistance and to solve their "debt problems." The foreclosure case was dismissed on July 27, 2011.

**ANSWER:     Citi admits that a complaint for foreclosure was filed on or about May 26, 2011 and dismissed on or about July 27, 2011.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 87 and therefore denies the same.**

88.     On August 1, 2011, Plaintiff called Defendant to make her August payment. Defendant's employee stated that each time she entered her account number into the payment system, the name "Ricardo Garza" appeared. Plaintiff, who was out of town, was instructed to send payment *via* mail or internet once she returned home. Before Plaintiff returned home, she began receiving collection calls. Plaintiff immediately called Defendant and was told to make her payment over the phone. Plaintiff did authorize a payment over the phone but continued to receive collection calls for the month of August.

**ANSWER:     Citi admits only that, upon information and belief, Plaintiff contacted Citi regarding her mortgage payments in or about August, 2011 and that there was difficulty processing the payment.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 88 and therefore denies the same.**

89.     On August 11, 2011, Plaintiff received a letter from Defendant stating that her account was overdue because her payment had not been received by August 11, 2011 as the parties agreed. Defendant requested $1,826.69, including $179.00 in late fees. Plaintiff did in fact authorize a telephone payment with Defendant *via* check #5054 for $1,601.57 on August 10, 2011. The check cleared her account on August 15, 2011. *See* List of Plaintiff's Checks from July and August 2011, attached hereto and marked as "Exhibit M." Defendant misapplied Plaintiff's August telephone payment to a "Ricardo Garza's" account, which is why her account became "overdue."

**ANSWER:     Upon information and belief, Citi admits that a letter was sent to Plaintiff on or about August 11, 2011 and states that the content of the letter is included therein and denies any allegations inconsistent with the content of the letter.  Citi denies any allegations inconsistent with the August 11, 2011 letter.  Citi admits, upon information and belief, that Plaintiff authorized a payment of $1,601.57 on or about August 10, 2011 and that the payment was not immediately applied to Plaintiff's account and, answering further, Citi states that its agents worked to resolve the problem and the payment was promptly applied to Plaintiff's account.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 89 and therefore denies the same.**

90.     Plaintiff, after informing the Defendant that she did in fact make her payment and that it cleared her account, was forced to obtain proof from her bank showing that the check to Defendant had cleared. *See* "<u>Exhibit M</u>." On September 1, 2011, Defendant sent Plaintiff another letter stating that her account is past due $3,428.26, which included $46.12 in late charges and $179.00 in delinquency expenses. Defendant further stated that they have reported her late payment to a credit bureau.

**ANSWER:     Citi admits, upon information and belief, that Plaintiff was asked to provide a record of her August, 2011 payment.  Citi admits, upon information and belief, that a letter was sent to Plaintiff dated September 1, 2011 and states that the content of the letter is included therein.  Citi denies any allegations inconsistent with the September 1, 2011 letter.   Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 90 and therefore denies the same.**

91.     In September 2011, Plaintiff received a credit for $1,601.57 to her account due to the Defendant's prior error. Also in September, Defendant finally removed Plaintiff's husband's name from the loan and, in doing so, requested a new modification agreement be signed.

**ANSWER:     Citi denies that it made an error related to Plaintiff's August, 2011 payment and, answering further, states that that a credit of $1,601.57 was posted to Plaintiff's account in September, 2011 as part of Citi's resolution of the difficulty related to Western Union's processing of Plaintiff's payment.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 91 and therefore denies the same.**

92.     In October 2011, Plaintiff's payment was again misapplied to "Ricardo Garza's" account.  On October 19, 2011 Plaintiff received another letter from Defendant stating that her account was overdue and that $1,815.11, which included late charges and delinquency expenses, was due. Plaintiff received another letter from Defendant dated October 24, 2011 wherein it states that they are concerned over the delinquency of her account because they did not receive payment by October 24, 2011 as was agreed. Plaintiff did in fact make her payment in October *via* telephone check #5080 that cleared on October 14, 2011. Defendant misapplied Plaintiff's payment to "Ricardo Garza" for a second time.

**ANSWER:     Upon information and belief, Citi admits that Plaintiff's October, 2011 payment was not initially applied to her mortgage account and, answering further, states that after investigation the payment was promptly applied to Plaintiff's account.  Citi admits that letters were sent to Plaintiff dated October 19, 2011 and October 24, 2011 and states that content of the letters is included therein.  Citi denies any allegations that are inconsistent with the October 19, 2011 and October 24, 2011 letters.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 92 and therefore denies the same.**

93.     In December 2011, Defendant, once again, misapplied Plaintiff's payment and sent her two letters, dated December 16, 2011 and December 19, 2011, demanding payment. Plaintiff again misapplied her payment to a "Ricardo Garza" for the third time.

**ANSWER:     Upon information and belief, Citi admits that Plaintiff's December, 2011 payment was not initially applied to her mortgage account and, answering further, states that after investigation the payment was promptly applied to Plaintiff's account.   Citi**

**admits that letters were sent to Plaintiff dated December 16, 2011 and December 19, 2011 and states that the content of the letters is included therein. Citi denies any allegations inconsistent with the December 16, 2011 and December 19, 2011 letters. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 93 and therefore denies the same.**

94.    Sometime in December of 2011, Plaintiff requested from Defendant copies of her account statements. Defendant replied that several statements were missing and that they did not have copies for several of the months requested. *See* "Ex.G."

**ANSWER:    Upon information and belief, Citi admits the allegations set forth in paragraph 94. Answering further, Citi states that it provided Plaintiff with a detailed payment history in response to her inquiry.**

95.    Defendant misapplied Plaintiff's January 2012 payment to "Ricardo Garza's" account for the fourth time. Plaintiff was forced, again, to prove that she did in fact pay her mortgage.

**ANSWER:    Upon information and belief, Citi admits that Plaintiff's January, 2012 payment was not initially applied to her mortgage account and, answering further, states that after investigation the payment was promptly applied to Plaintiff's account. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 93 and therefore denies the same.**

96.    Starting in December of 2009 and continuing until May 2011, while the Plaintiff was placed in a seventeen (17) month "trial period," Defendant was able, through its own egregious misconduct, to significantly increase the fees and costs it could charge the Plaintiff and intentionally impeded and hindered Plaintiff's ability to receive a permanent modification within HAMP's three-month time-frame.

**ANSWER:    Citi denies the allegations in paragraph 96.**

97.    Upon information and belief, during the seventeen months that Plaintiff was placed in TPP status, Defendant was able to increase the principal balance of Plaintiff's account by capitalizing approximately $39,589.45 in costs, to be paid over the next thirty (30) years. Upon information and belief the amount capitalized (added to Plaintiff's principal balance) included $22,837.66, which is the capital costs accrued between the difference of the Plaintiff's original mortgage payment and her subsequent TPP payments from December 2009 until May 2011. Upon information and belief, Defendant also included in the capitalized balance approximately $19,216.86 in past due payments, which was also added to the principal balance of the loan. Defendant then wrote off $2,552.89 from the Plaintiff's account for late fees it charged per HAMP.

**ANSWER:  Citi denies the allegations in paragraph 97.**

98.     In addition to the $39,589.45 in capitalized costs Defendant applied to Plaintiff's principal balance upon permanent modification, Plaintiff already had paid: (1) $5,599.43 as an accrued capital interest cost from the difference between Plaintiff's TPP payment and original PITI payment from January 1, 2010, until May 1, 2010; (2) $5,397.20 in fees or other service charges in May 2010 when Defendant reversed her TPP payment, put her account into delinquency, and then demanded $23,933.88 to be paid immediately *via* certified funds.

**ANSWER:**     **Citi denies the allegations in paragraph 98.**

99.     Upon information and belief, the Defendant's refusal to follow the HAMP regulations extended Plaintiff's TPP period from three (3) to seventeen (17) months, resulting in Plaintiff paying approximately $57,300.14 in additional fees and costs in order to "modify" her loan so it was more affordable.

**ANSWER:**     **Citi denies the allegations in paragraph 99.**

100.     Had Defendant complied with the HAMP regulations, the costs Plaintiff incurred to receive a permanent modification would have been substantially less because the amount Defendant could have capitalized would have ended in April 2010, after the third month of the first TPP. However, Defendant intentionally dragged out her temporary status for an additional fourteen months; and to this day, continues to "misapply" funds to "Ricardo Garza's" account in order to push her into default, permitting another foreclosure attempt on her home.

**ANSWER:**     **Citi denies the allegations in paragraph 100.**

101.     At no point did the Defendant inform the Plaintiff that she should pay her original PITI payment in order to avoid the excessive costs it was accruing. Defendant even encouraged Plaintiff to make no payment or to continue paying her prior TPP amount, for several months, despite the Defendant not knowing the status of her loan modification or her anticipated future TPP amount. Plaintiff did not know that the difference between her original PITI payments and her TPP payments were being accrued for the seventeen months she sought a modification or that Defendant was accruing the costs in order to either: (1) tack onto them onto her principal loan balance in the event she successfully received a modification; or (2) utilize the excessive costs as a tool to force Plaintiff into imminent foreclosure in the event it could make her ineligible for modification and accelerate the past dues amounts.

**ANSWER:     Citi denies that it allowed excessive costs to accrue during Plaintiff's modification in order to tack these costs onto Plaintiff's balance or force her into foreclosure.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 101 and therefore denies the same.**

## COUNT I: VIOLATION OF THE ILLINOIS CONSUMER FRAUD & DECEPTIVE BUSINESS PRACTICES ACT

1-101. PLAINTIFF re-alleges paragraphs 1-101 from the facts set forth above as if and for paragraphs 1-101 of this Count I.

**ANSWER:** **Citi restates and incorporates by reference its answers to paragraphs 1-101 as if fully set forth herein.**

102. Plaintiff's first count is for Defendant's violation for the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (hereinafter "the Act).

**ANSWER:** **Citi admits that Plaintiff seeks to bring a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act and denies all other allegations and implications of paragraph 102.**

103. Plaintiff and Defendant fall within the Act's definition of a person.

**ANSWER:** **Citi states that the allegation in paragraph 103 is a legal conclusion to which no answer is appropriate.**

104. Defendant's banking practices while servicing Plaintiff's loan constitutes trade and commerce under the Act and at all relevant times hereto Defendant was engaged in trade and commerce within the Act's definition.

**ANSWER:** **Citi states that the allegation in paragraph 104 is a legal conclusion to which no answer is appropriate.**

105. Upon information and belief, Defendant services loans in Illinois for millions of Illinois consumers' home loans.

**ANSWER:** **Citi admits only that it services the home loans of customers in Illinois.**

106. At all relevant times herein, Plaintiff qualified for HAMP under the underwriting criteria and Defendant found that Plaintiff qualified for a permanent modification under HAMP because of the loss of her husband and his income. Plaintiff eventually received a permanent modification after being granted TPP status on four separate occasions.

**ANSWER:** **Citi states that the allegation in paragraph 106 that Plaintiff "qualified" for HAMP is a legal conclusion to which no answer is appropriate. Citi admits that Plaintiff received a permanent modification. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 106 and therefore denies the same.**

107.    The Act makes illegal unfair or deceptive acts or practices, including but not limited to, the use of any deception, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression, or omission of such material fact.

**ANSWER:    Citi states that the terms of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Act") are included therein and denies all allegations and implications inconsistent with the language of the Act.**

108.    The Act permits "any person who suffers actual damages as a result of a violation of this Act committed by any other person may bring an action against such person."

**ANSWER:    Citi states that the terms of the Act are included therein and denies all allegations and implications inconsistent with the language of the Act.**

109.    The Defendant, and its employees acting within the scope of their employment, deceived the Plaintiff by making false representations of material fact intending for her to rely on its misrepresentations in order to further Defendant's goal of increasing its profitability.

**ANSWER:    Citi denies the allegations in paragraph 109.**

110.    Plaintiff, intending to pay off her mortgage with life insurance proceeds, was first offered a modification in 2009 in order to "make [her] money work for [her]." Plaintiff relied on the advice of an agent of the Defendant—a professional financial services company—to her detriment. Subsequently, Defendant intentionally prolonged Plaintiff's "modification" by deliberately stringing her along in TPP status for seventeen months. Defendant deliberately kept Plaintiff in TPP status in order to prolong the time period it could accrue the difference in her original mortgage payment and her modified TPP payment as a capitalized cost. Defendant also used Plaintiff's reliance on its statement to incur excessive costs, late fees, and service charges that it could charge to the Plaintiff.

**ANSWER:    Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 110 related to Plaintiff's intention to pay off her mortgage in 2009 and therefore denies the same.  Citi denies all remaining allegations in paragraph 110.**

111.    Defendant continually refused to mail to Plaintiff the Initial Package in order to prolong her loan accounts TPP period for the sole purpose of accruing capitalized costs. Defendant also refused to process Plaintiff's TPP payments on multiple occasions in order to extend TPP, raise the accrued costs, and to avoid modification, despite that fact that she met the HAMP eligibility requirements.

**ANSWER:    Citi denies the allegations in paragraph 111.**

112.     Defendant's delay in responding to or reviewing Plaintiff's TPP requests and requests for her Initial Package was an omission utilized for the sole purpose to maximize the costs it could accrue and capitalize on her loan. Defendant subjected Plaintiff to a prolonged TPP in order to demand substantial costs it was surreptitiously accruing. Once the Defendant prolonged TPP to the point that the accrued capital costs would become unaffordable for Plaintiff, Defendant attempted to use the accrued deficiency to force Plaintiff into foreclosure. Foreclosure permits the Defendant to take possession of the property and reap the proceeds from selling the home in a foreclosure sale.

**ANSWER:**     **Citi denies the allegations in paragraph 112.**

113.     Defendant's conduct implicates consumer protection concerns and will result in grave public injury if its conduct is left unbridled. Defendant has engaged in a pattern of conduct that is designed to keep consumers in continuous TPP status in order to avoid permanent modification. It is in the Defendant's best interest to run up capital costs that it can add on to the principal balance of the loan rather than seek the $1,000 "incentive" it would receive from the government for a successful permanent modification. Defendant's position as a servicer of loans puts it directly in conflict with the interests of Illinois borrowers seeking modification because Defendant can reap hundreds of thousands of dollars in profit through foreclosure or servicing loans without a modification than the $1,000 it earns by permanently modifying a loan.

**ANSWER:**     **Citi denies the allegations in paragraph 113.**

114.     Defendant intentionally violated, and completely disregarded, numerous HAMP regulations governing the Making Homes Affordable Act. Defendant, *inter alia,* misrepresented to Plaintiff the status of her loan and modification, and failed to inform Plaintiff that, while she was making TPP payments—or in some months no TPP payments upon advice of the Defendant—Defendant was utilizing its accrued capital cost account to: (1) significantly increase the costs it could apply to Plaintiff's principal balance upon permanent modification; and/or (2) utilize its accrued capital costs as a means to facilitate a foreclosure sale by accumulating arrearages. After the accrued costs became significant, Defendant refused to process Plaintiff's TPP payments, thereby allowing it to accelerate her principal due under a loan. Accelerating Plaintiff's debt would enable it to take possession of the home in foreclosure if Plaintiff could not afford the accelerated debt principal becoming due immediately.

**ANSWER:**     **Citi denies the allegations in paragraph 114.**

115.     Defendant, on multiple occasions, made assertions to Plaintiff that her home was not facing foreclosure and that the modification was being processed. This was a material misrepresentation intended to induce complacency so that Plaintiff would lose her home in foreclosure.

**ANSWER:**     **Citi denies the allegations in paragraph 115.**

116.    Defendant, after granting Plaintiff a permanent modification in May 2011, did not retroactively convert Plaintiff's modification to an earlier date as required by HAMP HANDBOOK, Chapter II, § 9.5. Defendant did not retroactively convert Plaintiff's modification because doing so would have required it to refund to Plaintiff the capital costs, fees, and other charges it was able to extort by keeping Plaintiff in a continuous TPP status with the threat of foreclosure being held above her head.

**ANSWER:    Citi states the allegations set forth in paragraph 116 are legal conclusions to which no answer is appropriate and, answering further, states that the terms of the HAMP Handbooks are included therein and denies any allegations inconsistent with the terms of the HAMP Handbooks. Citi denies all remaining allegations in paragraph 116.**

117.    Defendant, on numerous occasions, omitted clear and concise information about the status of Plaintiff's modification and the process, and concealed from her the charges they were accruing in order to ensure Plaintiff's ignorance of all the costs and fees she would eventually have to pay through a protracted modification. The protracted modification was due to no fault of the Plaintiff who was perpetually and intentionally kept ignorant of the actual status of her loan modifications.

**ANSWER:    Citi denies the allegations in paragraph 117.**

118.    Unless the Defendant is held accountable for its flagrant, malicious deviations from HAMP, its egregious conduct and utter disregard for its duties, obligations, or responsibilities under the Making Homes Affordable Act, and its perversion of the Act for its own greed; its behavior will be repeated and perpetrated amongst other vulnerable Illinois consumers whose loans it services. Defendant's conduct was done with an utter indifference or conscious disregard for the Plaintiff's welfare.

**ANSWER:    Citi denies the allegations in paragraph 118.**

119.    Defendant's misrepresentations and omissions that it made to Plaintiff enables it to place loans into a quasi-permanent TPP status in order to increase the costs it can capitalize upon permanent modification. This behavior concerns all vulnerable consumers in Illinois that are seeking or have received a permanent modification through HAMP. The Defendant intentionally obstructed and impeded Plaintiff's modification because it is Defendant's best interest to mislead consumers away from a permanent modification into a quasi-permanent TPP status so that borrowers fall further and further behind through accrued capital costs. Perversely, the Defendant has created two unintentional possible avenues for profitability under HAMP: (1) it can recapitalize substantial sums of money if a permanent modification comes to fruition by prolonging TPP; or (2) it can use the arrearages as an insurmountable, unaffordable barrier that forces borrowers into foreclosure because the accrued sums become payable immediately if it knocks a borrower out of HAMP.

**ANSWER:    Citi denies the allegations in paragraph 119.**

120.    An action is necessary under this act to protect all Illinois consumers. If Defendant's actions continue to go unbridled, Illinois consumers will continue to be perversely exploited through a government program that was initially intended to remedy the housing crises by making homes more affordable. Instead, Defendant has transformed HAMP into a means to facilitate foreclosures and/or accrue profits it otherwise would not have been able to earn.

**ANSWER:**    **Citi denies the allegations in paragraph 120.**

121.    Defendant is currently being sued by the Commonwealth of Massachusetts for deceiving homeowners and misrepresenting information to borrowers regarding the loan modification programs under its consumer fraud statute.  Upon information and belief, Defendant is engaging in similar allegedly deceptive business practices and policies with Illinois consumers as it is with Massachusetts consumers.

**ANSWER:**    **Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 121 and therefore denies the same.**

122.    Plaintiff's lawsuit will serve the public interests of all Illinois consumers because it will take away Defendant and other servicer's ability to pervert HAMP in such a way that servicers can recapitalize thousands of dollars in costs by intentionally impeding and misleading borrowers from the permanent modification process through the continuous suppression of loans in a quasi-permanent TPP status.

**ANSWER:**    **Citi denies the allegations in paragraph 122.**

For the foregoing reasons, Defendant CitiMortgage, Inc. requests that the Court enter

judgment in its favor and against Plaintiff and grant all other appropriate relief.

### COUNT II:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1-122.  Plaintiff re-alleges and re-states paragraphs 1-101 of the Facts and paragraphs 102-122 of Count I as and for paragraphs 1-122 of this Count II.

**ANSWER:**    **Citi restates and incorporates by reference its answers to paragraphs 1-122 as if fully set forth herein.**

123.    Plaintiff at all times hereto was eligible for HAMP, received a TPP in January 2010 and on three other occasions, and received a permanent modification under the HAMP underwriting criteria due to suffering an economic hardship.

**ANSWER:**    **Citi states that the allegation in paragraph 106 that Plaintiff "qualified" for HAMP is a legal conclusion to which no answer is necessary or appropriate. Citi admits that Plaintiff received a permanent modification.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 123 and therefore denies the same.**

124.    Defendant granted Plaintiff's permanent modification request in May 2011.

**ANSWER:    Citi admits the allegations set forth in paragraph 124.**

125.    Upon information and belief, Defendant filed certifications stating that it was in compliance with, and the truth and accuracy of, the representations and warranties related to HAMP on a yearly basis. Based upon its certifications, Defendant knowingly violated numerous rules and regulations of HAMP, including, but not limited to:

a)    Defendant being "overwhelmed" to the point that Defendant was unable to receive, manage, retain, and retrieve Plaintiff's documents to ensure that she was not required to submit multiple copies of the same documents. Despite Defendant acknowledging receipt of the Initial Package documentation from her second modification attempt on May 28, 2010, Plaintiff was required to resubmit the same documentation for two subsequent modification attempts before her loan was finally modified.

b)    Defendant was "overwhelmed" to the point that it was unable to resend the Initial Package to Plaintiff despite her making payments, thereby accepting the benefits of HAMP and the trial payment plan. Additionally her repeated calls asking the Defendant about the status of her Initial Package went unheeded and were ignored.

c)    Upon information and belief, Defendant intentionally or recklessly failed to have adequate staffing, written procedures, resources, and facilities for its modification department, resulting in needless delay of Plaintiff's eventual modification and resulted in Plaintiff's loan being referred to foreclosure on two separate occasions despite it being TPP status of having been granted a permanent modification.

d)    Upon information and belief, Defendant failed to review and/or implement a quality assurance program that would effectively avoid Plaintiff's adverse impacts within HAMP.

e)    Defendant failed to resend the Initial Package communication to Plaintiff despite Plaintiff making repeated calls notifying Defendant that no Initial Package had been received. Defendant's receipt of Plaintiff's first TPP payment in January 2010 served as the notice to Defendant of the borrower's acceptance of HAMP and its conditions. Defendant's refusal to communicate clearly with the Plaintiff and inform her of what documentation was needed in order to receive a modification, or to clearly inform her of the status of her modification, was a clear violation of HAMP.

f)    Defendant attempted to foreclose on Plaintiff's home on two separate occasions despite Plaintiff's compliance with her TPP payments and being in a modified status which was contrary to HAMP regulations precluding the initiation of foreclosure. Plaintiff timely made her TPP payments unless they were refused by the Defendant, which occurred on multiple occasions for the sole purpose of avoiding a permanent modification. Defendant never requested the necessary documentation from Plaintiff prior to foreclosing on Plaintiff's home.

g)    Plaintiff routinely and deliberately refused Plaintiff's TPP payments and refused to request, or keep, the documentation she provided to them for her modification

purposes. These refusals were for the deliberate purpose of preventing Plaintiff from receiving a timely modification. This would allow Defendant to accrue excessive capital costs and interest at 9.5%, the pre-modification rate, or foreclose on Plaintiff's home if it could forcibly disqualify her from TPP due to alleged non-compliance with HAMP's conditions.

h)  Defendant did not retain all documentation received from Plaintiff so that it could keep her in TPP status thereby accruing excessive capital costs rather than offering her a timely permanent modification that would preclude the continued accrual of 9.5% interest.

i)  Plaintiff should have been offered a permanent modification within three months of January 1, 2010, but due to Defendant's delay, obstruction, and impediments, her modification was not completed until May 2011. Defendant should have retroactively converted Plaintiff's mortgage to April 2010 and refunded the costs it charged her from April 2010 until May 2011, but it did not retroactively convert her modification as HAMP requires.

j)  Defendant intentionally reversed Plaintiff's TPP payments in order to accelerate the past amounts due in 2010. This was an attempt to remove Plaintiff from TPP status in order to further suppress her ability to stay current with her mortgage, thereby resulting in foreclosure of her home.

k)  Defendant intentionally refused to process Plaintiff's automatic draft payments on numerous occasions in order to disqualify her from receiving a modification and to facilitate imminent foreclosure filings on her home in contravention of HAMP. Defendant willfully acted this way because it was more profitable for it to delay or prevent loan modification. Permanent modification results in Defendant forgoing thousands of dollars in profit it can no longer receive through interest and/or late fees. The amount of interest Defendant would forgo in modification greatly exceeds the $1,000 it receives from the government for successful modifications.

**ANSWER:**    **Citi denies the allegations in paragraph 125 and specifically denies the allegations in subparagraphs (a) through (k) of paragraph 125.**

126.    Defendant, despite receiving billions of dollars in government funds, part of which was allocated for loan modifications, acted with willful and wanton indifference to the Plaintiff's rights based upon its certification of complying with HAMP's rules, regulations, stipulations, and warranties. Defendant used its ability to accrue capital costs—the difference between the original PITI and TPP payment—as subterfuge to accrue capital costs that had to be paid to it in order to prevent the foreclosure of Plaintiff's home. Defendant utilized HAMP as a tool to extort over $50,000 from Plaintiff, funds that Defendant could not have otherwise charged without perverting the HAMP regulations.

**ANSWER:**    **Citi denies the allegations and factual and legal conclusions set forth in paragraph 126.**

127.     Defendant's willful and wanton misconduct that exploited the emotionally and financially vulnerable Plaintiff through a protracted loan modification process with constant threats of foreclosure, all carried out for Defendant's own selfish-greed for profits, exceeds all bounds of human decency and is intolerable.

**ANSWER:     Citi denies the allegations and factual and legal conclusions set forth in paragraph 127.**

128.     Plaintiff became embarrassed, humiliated, and ashamed after finding out—from her neighbor—that her home was actively being pursued in court for a foreclosure action due to the Defendant's intentional or reckless misconduct that extremely deviated from HAMP's regulations.

**ANSWER:     Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 128.**

129.     Defendant was aware that delaying and hindering Plaintiff's modification attempts, its failure to follow HAMP regulations, and refusing and/or misapplying her payments had a high probability of causing severe emotional distress in Plaintiff by putting her in perpetual fear of becoming homeless with her two children. Defendant willfully pursued this deplorable course of conduct despite Plaintiff being in TPP status or permanent modification.

**ANSWER:     Citi denies the allegations and factual and legal conclusions set forth in paragraph 129.**

130.     Defendant intended to block Plaintiff's modification, charged exorbitant loan-related fees, and proceeded to attempt foreclosure on Plaintiff's home, which was eligible for a HAMP modification, despite the high probability that its conduct would inflict severe emotional distress and was with reckless disregard of that probability.

**ANSWER:     Citi denies the allegations and factual and legal conclusions set forth in paragraph 130.**

131.     Defendant, on multiple occasions, made untrue assertions to Plaintiff that her home was NOT facing foreclosure and that her modification was being processed. Plaintiff was emotionally devastated upon learning that her home was actually in foreclosure despite doing everything Defendant asked of her.

**ANSWER:     Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 131 related to Plaintiff's emotional state and therefore denies the same. Citi denies the remaining allegations and factual and legal conclusions set forth in paragraph 131.**

132.     Due to Defendant's intentional or reckless deviation from the HAMP regulations in complete disregard for Plaintiff's rights, Plaintiff suffers from depression, anxiety, and other extreme emotional issues that were directly caused by Plaintiff's seventeen-month ordeal fighting Defendant's foreclosure efforts and Defendant's willful resistance to a permanent modification.

**ANSWER:     Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 132 related to Plaintiff's emotional state and therefore denies the same. Citi denies the remaining allegations and factual and legal conclusions set forth in paragraph 132.**

133.     Plaintiff perpetually suffers from anxiety to this day, as she fears Defendant's continuous "misapplied payments" to a "Ricardo Garza's" account will potentially result in another foreclosure filing. Plaintiff cannot emotionally handle Defendant's continued intentional or reckless conduct pertaining to her loan.

**ANSWER:     Citi denies that it intentionally engaged in any wrongful conduct. Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 133 and therefore denies the same.**

134.     Defendant's deliberate refusal to comply with HAMP prohibited Plaintiff from adequately grieving the loss of her husband and compounded the emotional suffering she had to endure. Throughout the modification process, she was constantly receiving mail addressed to her husband due to the foreclosure filings, was required to re-send his death certificate on multiple occasions, and consistently had to handle and cope with all the Defendant's "mistakes" arising from her loan modification. Defendant's conduct compounded and exacerbated her emotional problems arising from her husband's death, and delayed her ability to complete the grieving process after the tragic loss of her husband.

**ANSWER:     Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 134 related to Plaintiff's emotional state and therefore denies the same. Citi admits only that certain correspondence to Plaintiff included the name of her deceased husband. Citi denies all remaining allegations in paragraph 134 including that it deliberately refused to comply with HAMP.**

135.     Defendant's conduct made Plaintiff emotionally unavailable to her children during the time they needed her most—after losing their father. Plaintiff's stress, depression, and anxiety arising from the Defendant's intentional interference and obstruction of her loan modification has inhibited her ability to nurture her children or help them cope with the loss of their father during such a sorrowful time in her and her children's lives. This created an additional extreme emotional and financial burden upon her due to Defendant's intentional or reckless conduct.

**ANSWER:     Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 135 related to Plaintiff's emotional state and therefore denies the same. Citi denies all remaining allegations in paragraph 135.**

136.   Plaintiff can no longer volunteer at her children's events due to the shame and humiliation she feels from her modification experience. She is embarrassed to be seen in her community because of the stigma attached to her after her home was put into foreclosure—twice. Additionally, she lives with constant shame and self-regret from relying on Defendant's representations and assertions to pursue a modification so that her money can be "put to work" for her. The only thing Plaintiff's money went to work for was the Defendant's accrued capital costs and fees it charged while deliberately prolonging the modification process. Defendant further suffers from extreme grief, resentment, regret, and emotional distress because she was unable to be the strong, involved parent involved in her children's activities during her seventeen-month-long modification process. Plaintiff began relying on other individuals to assist her in taking care of herself, her home, her children, and pet, because she was unable to muster the energy or ambition to be involved and engaged in normal productive activities because of the constant fear that she would lose her home.

**ANSWER:     Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 136 related to Plaintiff's emotional state and therefore denies the same. Citi denies all remaining allegations in paragraph 136.**

137.   Had Defendant not abused the HAMP process to accrue excessive costs, Plaintiff would have substantially more funds for her children's future education and/or investment income to meet her family's needs. Plaintiff's income is less than her current, reasonable living expenses. Plaintiff worries extensively about running out of funds and being unable to provide for her children. Defendant's accrued costs and fees significantly depleted the funds she needs to meet her and her children's long-term needs. Defendant's conduct forced Plaintiff to exhaust a substantial portion of the funds from the insurance proceeds in order to avoid imminent foreclosure on two separate occasions.

**ANSWER:     Citi denies that it purportedly "abused the HAMP process" to accrue excessive costs.   Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 137 related to Plaintiff's emotional state or current financial situation and therefore denies the same.**

138.   From October 2009 through January 2010, Plaintiff was seeking counseling and therapy for her emotional issues stemming from her husband's death. Plaintiff's therapy was discontinued in January 2010 after she switched to an insurance provider that did not cover therapy expenses. After Defendant approved her for a loan modification trial period in December 2009, Plaintiff felt things would begin to improve for her and discontinued therapy. Two months later, Defendant's conduct that intentionally denied, hindered, and prolonged Plaintiff's modification, and also placed her home in foreclosure, caused Plaintiff to experience severe emotional distress and suffer from severe depression and anxiety.

**ANSWER:     Citi denies that it intentionally denied, hindered or prolonged Plaintiff's modification.   Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 138 related to Plaintiff's emotional state and therefore denies the same.**

139. Due to Defendant's conduct, Plaintiff became extremely depressed with unmanageable anxiety and was forced to cope on her own without the professional help she needed. Plaintiff's doctor prescribed her Lexapro in November 2010 and February 2011 in order to ameliorate the debilitating stress and other emotional issues she was suffering due to the Defendant's willful conduct impeding her modification. Lexapro treats depression and generalized anxiety disorders.

**ANSWER:   Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 139 related to Plaintiff's emotional state and therefore denies the same. Citi denies all remaining allegations in paragraph 139 including that it willfully impeded Plaintiff's loan modification.**

140. Plaintiff has suffered many sleepless and restless nights, in tears, over the high possibility she was going to lose her home due to the Defendant's intentional misconduct impeding her modification. Plaintiff had other days where she could not get out of bed because the emotional distress placed upon her by the Defendant's willful conduct was too much for her to bear.

**ANSWER:   Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 140 related to Plaintiff's emotional state and therefore denies the same. Citi denies all remaining allegations in paragraph 140, including that it willfully or intentionally engaged in any wrongful conduct.**

141. Plaintiff's emotional distress was caused by Defendant's conduct over the past twenty-four months by, *inter alia:* (1) making persistent threats of foreclosure; (2) using HAMP as a tool to extort from her excessive accrued capital costs; and (3) continuing to misapply her permanent modification payments to "Ricardo Garza" thereby threatening another mortgage default. The Defendant's conduct is so severe it exceeds all bounds of human decency that a reasonable person could not be expected to endure.

**ANSWER:   Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 141 related to Plaintiff's emotional state or the cause of Plaintiff's emotional state and therefore denies the same. Citi denies all remaining allegations in paragraph 141.**

142. To date, Defendant continues to intentionally or recklessly force the Plaintiff's modification into loan default and subsequent foreclosure by "misapplying" her monthly mortgage payment to a "Ricardo Garza's" account on four separate occasions. Plaintiff continues to suffer extreme emotional distress because her payments are routinely being misapplied, which may result in Defendant filing another foreclosure action and putting her in default under her permanent modification.

**ANSWER:   Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 142 related to Plaintiff's emotional state and therefore denies the same. Citi denies all remaining allegations in paragraph 142, including that it willfully or intentionally engaged in any wrongful conduct.**

143.     Despite Defendant's clear errors, it continually places the burden on Plaintiff to fix its errors, show proof of its errors, and requires the Plaintiff to engage in long, frustrating telephone conversations where she is forced to wait, on hold, for long periods of time, or is passed along to multiple employees of the Defendant. This process of having to deal with multiple people to remedy Defendant's callous "mistakes" further causes anxiety and extreme frustration and helplessness in the Plaintiff. Plaintiff has had to force the Defendant to move her payment from a "Ricardo Garza's" account four times in the last six months.

**ANSWER:     Citi lacks knowledge or information sufficient to respond to the allegations in paragraph 143 related to Plaintiff's emotional state or the cause of Plaintiff's emotional state and therefore denies the same.  Citi admits that it requested further information from Plaintiff related to her mortgage payments on occasion.  Citi lacks knowledge or information sufficient to respond to the remaining allegations in paragraph 143.**

144.     Defendant's conduct outlined above did, and is, proximately causing Plaintiff's extreme emotional distress.

**ANSWER:     Citi denies the allegations in paragraph 144.**

For the foregoing reasons, Defendant CitiMortgage, Inc. requests that the Court enter judgment in its favor and against Plaintiff and grant all other appropriate relief.

### Count III
### (Dismissed 12/21/12)

Citi makes no response to the allegations set forth in Count III of Plaintiff's Complaint as this claim was dismissed by the Court's December 21, 2012 Order.

### Count IV
### (Dismissed 12/21/12)

Citi makes no response to the allegations set forth in Count VI of Plaintiff's Complaint as this claim was dismissed by the Court's December 21, 2012 Order.

### Count V
### (Dismissed 12/21/12)

Citi makes no response to the allegations set forth in Count V of Plaintiff's Complaint as this claim was dismissed by the Court's December 21, 2012 Order.

For the foregoing reasons, Defendant CitiMortgage, Inc. requests that the Court enter judgment in its favor and against Plaintiff and grant all other appropriate relief.

## AFFIRMATIVE DEFENSES

For its affirmative defenses, Citi states as follows:

### First Affirmative Defense

Plaintiff's claims are barred by the Illinois Credit Agreements Act to the extent they rely on oral representations related to her mortgage.

### Second Affirmative Defense

To the extent Plaintiff suffered from emotional distress, it was caused by other persons, entities and circumstances and not Citi.

### Third Affirmative Defense

Plaintiff's negligence in failing to discover the initial package delivered to her door and in failing to properly make phone payments caused and/or contributed to any damages.

### Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the statute of frauds.

### Fifth Affirmative Defense

Plaintiff is estopped from asserting any claims against Citi and is therefore barred from the statutory and common law claims asserted.

### Sixth Affirmative Defense

Citi gives notice that it intends to rely on the doctrines of offset and recoupment with respect to unsatisfied indebtedness, if any, of Plaintiff.

### Seventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrine of preemption

### Eighth Affirmative Defense

Plaintiff's claims are barred in whole or in part by failure to mitigate damages.

### Ninth Affirmative Defense

Citi is not liable by reason of its compliance with applicable statutes, laws, regulations and guidelines.

### Tenth Affirmative Defense

Citi's liability, if any, is limited pursuant to the all applicable language, contracts,

covenants, conditions, restrictions and bylaws operating as between the parties or the language, loan agreements, contract or contracts pursuant to which Citi performed which are the subject of this action.

### Eleventh Affirmative Defense

Plaintiff's alleged damages are speculative and uncertain and, therefore, not compensable, in whole or in part.

### Twelfth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrines of consent and ratification.

### Thirteenth Affirmative Defense

Plaintiff accepted benefits of the transaction and is therefore precluded from recovery.

### Fourteenth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the voluntary payment doctrine.

### Fifteenth Affirmative Defense

Citi's actions were taken in good faith with reasonable commercial justification and Plaintiff's claims are therefore barred in whole or in part.

### Sixteenth Affirmative Defense

Plaintiff's claims are barred in whole or in part because Citi's actions were justified or excused.


For the foregoing reasons, Defendant CitiMortgage, Inc. requests that the Court enter

judgment in its favor and against Plaintiff and grant all other appropriate relief.

Respectfully submitted,

Dated: May 14, 2013            By: /s/ Brittany E. Kirk

Todd A. Rowden (#6201929)
Timothy L. Binetti (#6282534)
Brittany E. Kirk (#6294386)
THOMPSON COBURN LLP
55 East Monroe Street
Chicago, IL 60603
312.346.7500
***Attorneys for CitiMortgage, Inc.***